Paper No. 41
ejs

THIS DISPOSITION IS CITABLE
AS PRECEDENT OF THE TTAB          JULY 28, 99

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

Arnita Y. Boswell and James W. Clement

v.

Mavety Media Group Ltd.
_____

Opposition No. 99,058
to application Serial No. 74/066,893
filed on June 7, 1990
_____

James W. Clement, pro se and as attorney for Arnita Y.
Boswell

Lawrence E. Abelman of Abelman Frayne Rezac & Schwab for
Mavety Media Group Ltd.
_____

Before Cissel, Seeherman and Hohein, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Arnita Y. Boswell and James W. Clement have opposed the

application of Mavety Media Group Ltd. to register BLACK

TAIL, with the word "black" disclaimed, for adult

entertainment magazines.[1]  Although their amended notice of

---

[1]  Application Serial No. 74/066,893, filed June 7, 1990.  The
application was filed based on an asserted intention to use the
mark in commerce; an amendment to allege use was subsequently

opposition[2] is filled with argument, opposers essentially allege that opposer Arnita Y. Boswell is an African American female and the mother of a daughter, and that opposer James M. Clement is a white male with four children and seven grandchildren; that "adult entertainment" is to some extent prurient in nature and purpose; that in the minds of a substantial portion of the general public one distinct type of adult entertainment magazine includes crude, vulgar photographs of naked and scantily clad women in pornographic poses; that the purpose of including such photographs of women in sexually provocative poses is to sexually arouse the male readers of the magazines; that in the context of the marketplace and judging by the content of the magazines, the purpose of the photographs of these women is to characterize women as mere female sexual objects to be used by men to satisfy their sex drive impersonally; that a substantial portion of the general public would immediately conclude, upon seeing or hearing the word TAIL used in connection with an adult entertainment magazine, that the

_____

filed, asserting first use and first use in commerce on July 2, 1990.

[2] Following the institution of the proceeding applicant filed a motion to strike irrelevant, immaterial and impertinent allegations from the notice of opposition. In response, opposers moved for leave to file an amended notice of opposition. The Board accepted the amended notice, since under the Federal Rules of Civil Procedure a plaintiff may amend its pleading once before a responsive pleading is filed. Fed. R. Civ. P. 15(a). However, in view of applicant's statement that it intended to file another motion to strike, and to avoid a further round of papers, the

magazine was an adult entertainment magazine of the type described above, and would further recognize the word TAIL used in connection with such an adult entertainment magazine as a vulgar and derogatory reference to a woman with whom a man has had or intends to have sex, or a vulgar and derogatory reference to all women as female sex objects; that a large percentage of the general public who see or hear the words BLACK TAIL used for adult entertainment magazines will consider the words to be insulting and derogatory to black women and to women of every color; that a substantial portion of the general public will recognize the words BLACK TAIL as used in the name of adult entertainment magazines as characterizing black, or African American, women as mere female sexual objects, and this attitude toward black women is similar to the attitude of slave owners toward black women during the time of slavery; and that some portion of the general public may not care that the use of the words BLACK TAIL are insulting and derogatory to black women because they are prejudiced, but that they will recognize that the use of the words TAIL or BLACK TAIL in connection with adult entertainment magazines is a vulgar reference to a woman with whom the man has had or intends to have sex, or is a vulgar reference to all women, especially black women, as female sex objects.

---

Board reviewed the pleading and sua sponte struck certain

Accordingly, opposers allege that the use of BLACK TAIL as the name of adult entertainment magazines disparages women as a group, and disparages African American women as a group, brings women as a group into contempt, and brings African American women as a group into contempt, brings women as a group into disrepute, and brings African American women as a group into disrepute; that the use of BLACK TAIL for adult entertainment magazines is, with respect to women in general, African American women in particular, and a substantial portion of men of all races and colors in the United States, shocking to the sense of decency or propriety, is disgraceful, disreputable and offensive, and gives offense to the conscience or moral feelings.

In its answer applicant denied the salient allegations of the notice of opposition. Applicant also asserted, as "affirmative defenses," that the views of the mark alleged by opposers are those of the opposers themselves, and not of a substantial composite of the relevant public, and that the provisions of Section 2(a) of the Trademark Act prohibiting the registration of "scandalous or immoral" and "disparaging" marks are unconstitutional.

The record includes the pleadings; the file of the opposed application; and the affidavit testimony, submitted by stipulation of the parties, of opposers, in which Ms.

---

paragraphs as failing to state proper grounds for opposition.

4

Boswell states that she is an adult African American woman, has one child (a daughter) and two grandchildren, and in which Mr. Clement states that he is a white adult male with four children and seven grandchildren. Both state their belief that they would be damaged by the registration of applicant's mark. That is the extent of opposers' testimony. Opposers have also made of record, under a notice of reliance, definitions of the word "tail" taken from seven dictionaries, and copies of ten magazines, including issues of "Big Butt," "Black Tail" and "High Society." Applicant has relied on opposers' responses to applicant's interrogatories and requests for admission; various third-party registrations including those containing the word or element "TAIL"; applicant's own registration for the mark TAIL ENDS for adult entertainment magazines; a dictionary definition of the word "tail"; third-party registrations for marks which, according to applicant, are suggestive of sexual intercourse or promiscuity, and dictionary definitions of the words in such registrations; excerpts from publications containing references to "black tail(s)" and "tail"; third-party registrations for adult entertainment magazines; definitions from a slang dictionary; and a copy of an adult entertainment magazine.

Opposers also submitted a second notice of reliance as part of their rebuttal testimony.[3] Applicant objected to this submission, stating that it was not proper rebuttal, and should have been submitted by opposers as part of their case-in-chief. The material in question consists of definitions of "tail" taken from seven slang dictionaries, as well as three standard dictionary definitions of "sex object." In responding to applicant's objection, opposers acknowledge that in their case-in-chief they did not submit any excerpts from slang dictionaries. However, they assert that such submissions are appropriate as part of their rebuttal testimony because applicant, during its testimony period, submitted an excerpt from a slang dictionary.

The slang dictionary excerpt submitted by applicant is for the word "occupy," which had the meaning of "to take sexual possession of a woman" in the 1400s-1600s. Applicant's submission of this dictionary excerpt does not open the door for opposers to submit any slang dictionary definitions. Clearly if opposers wanted to use slang dictionary definitions of "tail" to show this term has a derogatory meaning, they should have done so as part of their case-in-chief. Accordingly, these definitions will not be considered. Similarly, because the definitions of "sex object" appear to have been submitted as an explanation

---

[3] The Board granted opposers' motion for leave to file a late

of the slang dictionaries' definitions of "tail," they will not be considered.  Moreover, although the Board may take judicial notice of dictionary definitions, see **University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.**, 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), in this case we decline to do so.  The taking of judicial notice in these circumstances is discretionary with the Board.  See **Litton Business Systems, Inc. v. J.G. Furniture Company, Inc.**, 190 USPQ 431 (TTAB 1976), denying req. for recon., 190 USPQ 428 (TTAB 1976).  For the same reason that it would be unfair to applicant to allow opposers to submit the dictionary definitions as part of opposers' rebuttal testimony, at a point where applicant has no opportunity to respond, it would be inappropriate for the Board to consider what opposers failed to make of record in the proper manner.

Both parties filed briefs on the case.[4]  An oral hearing was not requested.

---

notice of reliance.
[4]  Although the Board had previously warned opposers that, "having tested the limits of the Board's willingness to grant extensions of time to brief a case," opposers would not be granted an extension of time to file a reply brief, opposers nonetheless, 27 days after their reply brief was due, moved to reopen the briefing schedule so that the Board could consider their accompanying brief.  This motion was opposed by applicant, which in turn filed a motion to strike the reply brief.  The Board denied opposers' motion to reopen proceedings to file a reply brief because opposers had not established excusable neglect, and because the brief, which was filed without prior leave of the Board, exceeded the page limitation of Rule

Although in the notice of opposition opposers alleged that applicant's mark was not registrable on the grounds that it is scandalous, disparaging and brings women and particularly African-American women into contempt and disrepute, in their brief opposers specifically state that they are not pursuing this opposition insofar as it is based on the scandalous nature of applicant's mark. Accordingly, the only grounds for us to consider are whether applicant's mark "consists of or comprises … matter which may disparage … persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute…." Section 2(a) of the Trademark Act, 15, U.S.C. 1052(a).

The first question we must consider is whether opposers have established their standing to pursue this opposition. As noted, opposers have elected not to pursue the claim that applicant's mark is scandalous. In terms of the claims that the mark is disparaging or will bring persons into contempt or disrepute, opposers alleged in their notice of opposition that the use of the words BLACK TAIL as the name of adult entertainment magazines disparages or brings into contempt or disrepute women as a group, and in particular disparages or brings into contempt or disrepute African American women. The evidence shows that opposer Boswell is an African

2.128(b). Accordingly, opposers' reply brief has not been

8

American woman.  As a member of the group which is asserted to be disparaged or brought into contempt or disrepute by the mark BLACK TAIL, she has clearly demonstrated her standing in this proceeding.  See **Ritchie v. Simpson**, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); **Harjo v. Pro Football Inc.**, 50 USPQ2d 1705 (TTAB 1999); **Bromberg v. Carmel Self Service, Inc.**, 198 USPQ 176 (TTAB 1978).

However, in the notice of opposition opposers do not allege that the use of BLACK TAIL for adult entertainment magazines disparages or brings into contempt or disrepute white males, the group to which opposer Clement belongs.  Aside from the allegations of standing with respect to the issue of whether the mark is scandalous (which ground has been dropped by opposers), the only allegations relating to opposer Clement's standing are the following:

> ¶ 38. As a member of said at present majority community, he is concerned--out of a sense of fairness and equity, social ethics, belief in democracy, and his own long range enlightened self-interest in the maintenance of an ethical and democratic society in the United States--that the rights of the members of every minority community be respected in all matters.
>
> ¶ 39. Any objective observer of race relations in the United States today recognizes that violations of the rights of members of the African American community, and acts of disrespect to members of said community by members of

considered.

> the majority community, are likely to
> lead to (a) an antagonistic attitude on
> the part of many members of the minority
> community, (b) a sharpening of racial
> bigotry on the part of any already
> racially prejudiced members of the
> majority community, (c) a worsening of
> relations between the two communities,
> and (d) in the worst case, violence
> between members of the two communities.

In the recently decided case of **Ritchie v. Simpson**, supra, the Federal Circuit discussed at some length the elements necessary to assert an allegation of standing, i.e., a belief that the plaintiff will suffer some kind of damage if the mark is registered; a real interest in the proceedings; and a reasonable basis for his belief of damage. The Ritchie case is different from the one presently before us, in that it involved a motion to dismiss the claim of scandalousness in view of a lack of a sufficient pleading of standing. In deciding such a motion, the Court had to accept as true all well-pled and material allegations of the complaint, and construe the complaint in favor of the complaining party. See **Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.**, 823 F.2d 490, 2 USPQ2d 2021 (Fed. Cir. 1987). However, the Court pointed out that a plaintiff's "allegations alone do not conclusively establish standing. If challenged, the facts alleged which establish standing are part of the [plaintiff's] case, and, as we said in *Lipton* [*Industries, Inc. v. Ralston Purina*

10

*Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982)], must be affirmatively proved." Ritchie at 50 USPQ2d 1029. Thus, the inquiry in the present case is whether opposer Clement has proven his standing, not whether his allegations of standing in the notice of opposition would be sufficient for the proceeding to go forward to trial.

In considering the issue of standing, we do not reach the question of whether, in a proceeding brought on the grounds of disparagement or bringing into contempt, a person who is not a member of the group alleged to be disparaged or brought into contempt can ever establish standing to object to a mark. Rather, we look only to Mr. Clement's own assessment of how he believes he is damaged, as set forth in paragraphs 38 and 39 of the notice of opposition, and the evidence which he has submitted in support thereof.

The only evidence related to Mr. Clement's standing is his affidavit testimony that he is a white male with children and grandchildren, and that he believes that he would be damaged by the registration of applicant's mark for adult entertainment magazines. He has not, however, submitted any evidence with respect to the allegations in the notice of opposition with respect to his own standing. In their brief, opposers state that a proper purpose of Section 2(a) is to "assure that the rights of the members of every minority community, including the black community, be

11

respected," p. 4.  Clearly opposer Clement is not a member of the black or other minority community; the allegations in the notice of opposition state just the opposite.  The only argument with respect to Mr. Clement's interest is the mere statement in the brief that he would suffer if there were a worsening in relations between the majority and the minority community.[5]  However, he has not provided any evidence in support of this claim.  Instead, he asks, in the brief, that the Board take judicial notice

> of the fact that violations of the rights of members of the African American community, and acts of disrespect to members of said community, by members of the majority community are likely to lead to (a) an antagonistic attitude on the part of many members of the minority community, (b) a sharpening of racial bigotry on the part of already racially prejudiced members of the majority community, (c) a worsening of relations between the two communities and (d) in the worst case, violence between members of the two communities.

Essentially opposer Clement asks us to take judicial notice of the allegations pleaded in paragraph 39 of the notice of opposition.  We decline to do so.  We do not believe that these statements are appropriate matter for judicial notice.  Rule 201 of the Federal Rules of Evidence

---

[5]  Mr. Clement also states that his wife, children and grandchildren would suffer the possible consequences of the worsening of race relations.  As the Board noted in its October 8, 1996 action, the allegations in the notice of opposition referring to damage to parties other than the opposers are improper and would be given no consideration.

provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Advisory Committee notes regarding the rule comment that "the usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses. If particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary. A high degree of indisputability is the essential prerequisite."

The statements of which opposer Clement would have us take judicial notice are argument and speculation, rather than facts with "a high degree of indisputability" or "capable of ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Accordingly, because opposer Clement has failed to establish facts on which he could base a reasonable belief that he would be damaged by applicant's registration of BLACK TAIL for adult entertainment magazines, we find that he has no standing in this proceeding.

This brings us to the substantive issue, whether opposer Boswell has shown that the applied-for mark may be disparaging to women, particularly African-American women, or bring them into contempt or disrepute.[6]  With respect to the ground of disparagement, opposers have, in their brief, devised a three-part method for analyzing whether a mark consists of disparaging matter, and then have gone about trying to prove that BLACK TAIL is disparaging under this test.  However, the Board will follow the judicially-established test set forth in **Harjo v. Pro Football Inc.**, 50 USPQ2d 1705 (TTAB 1999).  The Board in Harjo made an exhaustive analysis of the cases involving both scandalous and disparaging marks, and determined that the question of disparagement must be considered in relation to the goods or services identified by the mark in the context of the marketplace.  Id. at 1738.  Further, to the extent the matter in question is found to refer to an identifiable person or persons, in deciding whether the matter may be disparaging we must look to the views of the referenced group, as shown by the views of a substantial composite thereof.  Id. at 1739.  Thus, the Board in that case identified a two-step process, which requires that we first

---

[6]  Even if it were found that opposer Clement had established standing, the record and brief submitted by opposers applies to both of them.  Accordingly, our finding in this case with respect to opposer Boswell would be equally applicable to opposer Clement.

14

ask what is the meaning of the matter in question, and, second, whether that meaning may be disparaging, i.e., whether the mark may dishonor by comparison with what is inferior, or slight, deprecate, degrade, or affect or injure by unjust comparison.  Id. at 1738.  Because the notice of opposition and the arguments in opposers' brief assert that the mark BLACK TAIL disparages women in general, and African American women in particular, in deciding whether the mark may be disparaging, we must look to the views of the referenced group, and not to American society as a whole. Id. at 1739.

It seems appropriate to recite some of the history of this application at this point.  During the ex parte examination of the application, it was refused registration on the ground that the mark consists of immoral or scandalous matter.  Applicant appealed that refusal, and the refusal was affirmed by this Board, with one member of the panel dissenting, in an unpublished decision issued in 1993. Subsequently, our primary reviewing court, the Court of Appeals for the Federal Circuit, reversed the Board's decision, in **In re Mavety Media Group Ltd.**, 33 F.3d 1367, 31 USPQ2d 1923 (Fed. Cir. 1994).

The Court criticized the Board's majority decision on a number of points.  In particular, the Court found error in

the Board's reliance on dictionary sources which bore the editorial comment "usually considered vulgar" as the sole basis for finding that BLACK TAIL was scandalous as applied to adult entertainment magazines.  The Court specifically declined to determine whether a standard dictionary definition with an accompanying editorial designation of vulgarity alone was sufficient to demonstrate that a substantial composite of the general public considers that word to be scandalous, such that it would be unregistrable under Section 2(a).  What the Court did say was that, in addition to the vulgar definitions of "tail," the dictionary excerpts of record in the case also set forth non-vulgar definitions of "tail" in the context of an adult entertainment magazine.

> In view of the existence of such an alternate, non-vulgar definition, the Board, without more, erred in concluding that in the context of the adult entertainment magazine, the substantial composite of the general public would necessarily attach to the mark BLACK TAIL the vulgar meaning of "tail" as a female sexual partner, rather than the admittedly non-vulgar meaning of "tail" as a rear end.

Id. at 31 USPQ2d 1928.

Although the issue before the Federal Circuit was whether BLACK TAIL was scandalous, within the provisions of Section 2(a), as applied to adult entertainment magazines, many of the comments made by the Court in that decision are

16

applicable to the present case.  See **Harjo v. Pro-Football Inc.**, <u>supra</u> at 1738, stating that the issue of disparagement is related to the issue of scandalousness.  As we noted above, the Court in the decision on applicant's ex parte appeal found that dictionary definitions were not sufficient to prove that a substantial composite of the public would regard BLACK TAIL as scandalous, and applauded the practice of the Board in other cases involving the issue of scandalousness to allow marks to be published so that "if a group does find the mark to be scandalous…, an opposition proceeding can be brought and a more complete record can be established."  **In re Mavety Media Group Ltd.**, <u>supra</u> at 31 USPQ2d 1928, quoting **In re In Over Our Heads Inc.**, 16 USPQ2d 1653, 1654-55 (TTAB 1990).

Despite the comments by the Court, opposers have chosen to submit as evidence in their case only dictionary definitions of the word "tail" and adult entertainment magazines.  Opposers recognize that other evidence could have been submitted, in particular, "testimony of linguistic experts" and "the results of properly conducted public opinion surveys."  Brief, p. 9.  They contend, however, that persons opposing the registration of disparaging marks should not be forced to assume the cost of surveys.[7]  In any

_____

[7]  Opposers also disagree with the comments made by the Court in <u>Mavety</u> which suggest that the Patent and Trademark Office submit

17

event, opposers assert that the present case is different from the appellate case because it involves the issue of whether BLACK TAIL is disparaging, rather than whether it is scandalous.

We cannot agree with opposers that the comments made by the Federal Circuit in Mavety have no application to the issue in this case. In both cases, the question to be determined is public reaction; in the case of scandalous marks, the relevant group is a "substantial composite of the general public," while in the case of disparaging marks it is the group which is asserted to be disparaged, which may be reasonably determined by the views of a substantial composite thereof. **Harjo v. Pro-Football Inc.**, supra at 1739. We do agree with opposers to the extent that a party bringing a proceeding on the ground of disparagement should not be required to conduct a survey, particularly since a party with a real commercial interest in a mark is not required to conduct a survey to prove likelihood of confusion in a proceeding before the Board. See **Hilson Research Inc. v. Society for Human Resource Management**, 27 USPQ2d 1423 (TTAB 1993). However, this does not mean that

consumer surveys to prove a mark is scandalous. It is opposers' position that the PTO should not be forced to conduct opinion surveys; and that the primary responsibility for monitoring cases like the present one should be kept in the PTO, rather than relying on the public to prevent the registration of scandalous marks.

such a plaintiff is absolved from the requirement to show that the allegedly disparaged group views the mark at issue to contain or comprise disparaging matter.

This brings us to a consideration of the evidence submitted by opposers. The relevant dictionary definitions of "tail," as highlighted by opposers, are as follows:

> 17. *Plural.* A. A formal evening costume worn by men.
> 18. *Vulgar Slang.* The female pudendum.
> 19. *Vulgar Slang.* A female regarded as a sexual object.[8]
>
> ***
>
> 6. tails. a. See tail coat. … c. men's full-dress attire.
> 7. *Slang.* The buttocks or rump.
> 10. *Slang (vulgar).* a. coitus. b. a woman considered as a sexual object.[9]
>
> ***
>
> 18. tails. a. A formal evening costume typically worn by men.
> 19. a. *Slang.* The buttocks. b. *Vulgar Slang.* A sexual partner, especially a woman or girl.[10]
>
> ***
>
> 3(d) *colloq.* in *pl.,* a tailcoat; …
> 4a The buttocks….
> b The external genitals, esp. of a woman
> c Orig., a prostitute. Later, women collectively regarded as a means of male sexual gratification; sexual intercourse; (freq. In *piece of tail* s.v. PIECE *n*). *coarse slang.*[11]
>
> ***
>
> d. *slang.* …(ii) women regarded collectively (by men) as a means of sexual gratification; sexual

---

[8] The Illustrated Heritage Dictionary and Information Book, © 1977.
[9] Random House Unabridged Dictionary, 2d ed. © 1993.
[10] The American Heritage Dictionary of the English Language, 3d ed. © 1992.
[11] The New Shorter Oxford English Dictionary on Historical Principles, Vol. 2, © 1993.

> intercourse; a sexual partner. Freq. In
> phr. *A piece (or bit) of tail.*[12]
> ***
> 4. tails *pl* a: TAILCOAT b: full evening
> dress for men (came downstairs
> resplendent in ~s and white tie--Joseph
> Wechsberg
> 5a: BUTTOCKS <sits on his ~ at a desk--
> Frances & Richard Lockridge> b *slang*:
> SEXUAL INTERCOURSE--usu. considered
> vulgar[13]
> ***
> 4 *pl* a: TAILCOAT
> 5. b: a female sexual partner--usu.
> considered vulgar[14]

The adult entertainment magazines present graphic photographs of nude and scantily clad women in suggestive and explicit poses. One of these magazines is the May 1997 issue of applicant's magazine sold under the trademark at issue here, BLACK TAIL.

Opposers point to four vulgar meanings of the word "tail," namely, a female sex partner, the female genitalia, sexual intercourse, and a female sex object. In addition to this evidence, opposers argue in their brief that the Board should take judicial notice, based on "common experience," of "dirty talk" that is used when only males are present.[15]

---

[12] The Oxford English Dictionary, 2d ed. © 1989.
[13] Webster's Third New International Dictionary of the English Language, unabridged, © 1986.
[14] Webster's Ninth New Collegiate Dictionary, © 1984.
[15] To quote opposers, "As a result of such experiences, the meaning of many crude and vulgar words have become matters of common knowledge during the period when males are growing up (and frequently extending into adult life) through male street talk, factory talk, job site talk, locker room talk, dormitory and fraternity talk, armed forces talk, and the like. All but those males who have led relatively sheltered lives have heard--and

Opposers provide examples of the kinds of statements which may be made with "tail" having a vulgar meaning.

We decline to take judicial notice of these so-called common experiences which purportedly show that the word "tail" is used in a vulgar manner.  Certainly the experiences that opposers refer to in their brief do not constitute the kinds of indisputable facts that are contemplated by Rule 201 of the Federal Rules of Evidence, as discussed <u>supra</u>.  Even opposers acknowledge the shakiness of such position, recognizing that

> most female judges, and perhaps a few male judges as well, have not shared the experience at various times of hearing the word TAIL used in the crude, vulgar and disparaging way just discussed. This may lead to a reluctance on the part of some judges to take judicial notice of this type of common experience.
> Brief, p. 14.

If opposers had wanted to make evidence of this kind of word usage of record, she could easily have done so through testimony.  (If this type of locker room talk is as pervasive as opposers indicate, it would seem that there would be no shortage of witnesses.)  However, opposers have elected to try to prove that BLACK TAIL is disparaging solely on the basis of dictionary definitions and ten adult entertainment magazines.  In effect, we have in this record

---

have understood--such comments as 'I'm going to get me some tail tonight!' or 'How's about a little tail?'"  Brief, p. 13.

21

essentially the same evidence that was before the Board and the Court in the ex parte appeal.

As the Court said in Mavety, and as the present record shows, the word "tail" can have a variety of meanings as applied to an adult entertainment magazine. In particular, the dictionary definitions show that "tail" can mean "buttocks," and there is no indication from the dictionary definitions that such a meaning would be considered vulgar.

Having reviewed the issue of BLACK TAIL magazine which is of record herein, we find it difficult to believe that anyone, seeing the mark used for such a publication, would consider the phrase to refer simply to buttocks. The photographs in the publication are photographs of nude and scantily-clad African-American women, and while many of the photographs feature the rear ends of these women, a large number feature their breasts and genitalia, often showing the women using their fingers to further expose themselves. However, our principal reviewing Court stated quite clearly in Mavety that, in view of the existence of an alternate, non-vulgar definition of "tail," the Board, without more, erred in concluding that in the context of an adult entertainment magazine, a substantial composite of the general public would necessarily attach to the mark BLACK TAIL the vulgar meaning of "tail" as a female sexual

partner, rather than the admittedly non-vulgar meaning of "tail" as rear end. 31 USPQ2d 16 1928. Given that opposers have not provided any further evidence as to the meaning of "tail" than was present before the Court during the appeal, we cannot conclude that it is the vulgar meaning that the relevant public would attach to the mark, nor can the Board substitute its own judgment for that of the perspective of the relevant public.

We would also add that opposers have provided no evidence, beyond the dictionary definitions themselves, that women in general, or African American women in particular, believe themselves to be disparaged by the use of BLACK TAIL. Even in her affidavit Ms. Boswell testified only that she believed herself to be damaged by the registration of applicant's mark; she provided no testimony as to what the mark indicated to her personally, or why she felt it was disparaging. Nor did opposers supply any evidence with respect to the views of other women. Compare **Ritchie v. Simpson**, supra, in which opposer alleged that he had obtained petitions signed by people from all over the United States who agree with him that the marks at issue are scandalous; **Harjo v. Pro-Football Inc.**, supra, referring to a broad range of evidence, including testimony by several witnesses.

In view of the lack of evidence as to the perception of BLACK TAIL for adult entertainment magazines by the assertedly disparaged group, we cannot find that opposers have proved that the mark is disparaging within the meaning of Section 2(a) of the Trademark Act.

With respect to the ground that applicant's mark may bring women and particularly African-American women into contempt or disrepute, the same standards for determining whether matter in a mark may be disparaging are applicable to determining whether such matter brings "person, living or dead, institutions, beliefs, or national symbols into contempt or disrepute. **Harjo v. Pro-Football Inc.**, supra. Opposers appear to concede this point, because they do not discuss this ground separately, but specifically states in their brief that the single word "disparaging" is used throughout the brief as the equivalent of the statutory language in Section 2(a) that refers to "matter which may disparage ... any person, living or dead, ... or bring them into contempt or disrepute." For the same reasons which we have found opposers to have failed to prove that BLACK TAIL used on adult entertainment magazines may be disparaging, we find they have failed to prove that it may bring women, and particularly African-American women, into contempt or disrepute.

Finally, for the sake of completeness, applicant's affirmative defense that Section 2(a) is unconstitutional is rejected for the reasons given by the Court in <u>Mavety</u>, 31 USPQ2d at 1928.  See also, **In re International Flavors & Fragrances, Inc.**, __F.3d__, __USPQ2d__ (Fed. Cir. July 20, 1999).

Decision:  The opposition is dismissed.


R. F. Cissel


E. J. Seeherman


G. D. Hohein
Administrative Trademark Judges
Trademark Trial and Appeal Board