THIS DECISION IS
CITABLE AS PRECEDENT
OF THE TTAB

Mailed: February 15, 2006

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

Trademark Trial and Appeal Board
————————

In re Red Bull GmbH
————————

Serial No. 75788830
————————

Martin R. Greenstein of TechMark for Red Bull GmbH.

Esther Borsuk, Trademark Examining Attorney, Law Office 112 (Janice O'Lear, Managing Attorney).

————————

Before Hairston, Walters and Zervas, Administrative Trademark Judges.

Opinion by Walters, Administrative Trademark Judge:

An application has been filed by Red Bull GmbH to register on the Principal Register the mark BULLSHIT,[1] in standard character form, for the following goods and services:

---

[1] Serial No. 75788830, filed August 30, 1999, asserting ownership of an Austrian Registration, No. 180322, under Section 44(e) of the Trademark Act, and alleging a bona fide intention to use the mark in commerce, under Section 1(b) of the Trademark Act.

International Class 32:  beer, mineral waters, aerated waters, carbonated waters, flavored waters and other non-alcoholic beverages, namely, punches, soft drinks, smoothies and lemonades; sports drinks; energy drinks; isotonic drinks, hypertonic drinks and hypotonic drinks, for use and/or as required by athletes and those engaged in active or stressful sports and activities; fruit juices and fruit drinks, vegetable juices and vegetable drinks; syrups, powders, concentrates and effervescent tablets for making drinks and beverages; non-alcoholic cocktails and drinks;

International Class 33:  alcoholic beverages, excluding beers, namely rum, vodka, gin, tequila, whiskey, brandy spirits, distilled spirits and wine; alcoholic hot and mixed beverages, namely, alcoholic punches and energy drinks, mulled wine and alcoholic ciders; wines, potable spirits and liqueur; alcoholic beverage mixes, namely pre-mixed cocktail bases, powders, syrups, concentrates and effervescent tablets for making alcoholic cocktails; cocktails and aperitifs containing potable spirits or wine; wine cooler beverages, alcoholic lemonades, fruit drinks and smoothies, wine punches and wine cocktails; and

International Class 42:  catering; accommodation of guests, namely hotel and lodging services; restaurant and bar services, namely operation of bars, pubs, cafes, taverns and other permanent, temporary, portable or mobile establishments serving beer, wine and/or alcoholic or non-alcoholic beverages; restaurant and bar services, namely operation of snack bars, restaurants, diners, cafes and other permanent, temporary, portable or mobile establishments serving food, beverages and/or snacks of all types; medical services, namely, medical care; health care; beauty salon services, namely beauty care and personal grooming services; veterinary services; scientific and research services; licensing of intellectual property and consultation in the field of intellectual property rights; technical consultation and research services in the field of food and beverages, restaurants and bar

services, health and fitness, sports, sports training and physical performance; computer programming, namely development, maintenance and support of computer programs; providing facilities for exhibitions and fairs.

The trademark examining attorney has issued a final refusal to register under Section 2(a) of the Trademark Act on the ground that the mark consists of or comprises immoral or scandalous matter because it is offensive to a substantial composite of the general public.

Applicant has appealed. Briefs have been filed, but an oral hearing was not requested. We affirm the refusal to register.

*Preliminary Evidentiary Issues*

Neither of the two examining attorneys assigned to this application submitted any evidence during examination of the application. Instead, both the original and present examining attorneys relied entirely on the 1981 decision of the Board in *In re Tinseltown, Inc*., 212 USPQ 863, wherein the Board found the mark BULLSHIT to be scandalous in connection with handbags and personal accessories. However, with her brief, the examining attorney submitted several dictionary definitions of the term "bullshit" in support of her position.

Applicant objects to the Board's taking judicial notice of the definitions submitted with the examining

3

attorney's brief, arguing that the submissions are untimely. Applicant's other objections to this evidence address the probative value thereof rather than its admissibility and, thus, these objections are considered as argument, as appropriate, in the analysis of the refusal, *supra*.

The definitions of the term "bullshit" submitted by the examining attorney with her brief are shown below:

1. *Obscene. noun  Abbr*. B.S.  Foolish, insolent talk*;* nonsense. *verb intransitive*  1.  To speak foolishly or insolently.  2.  To engage in idle conversation. *verb transitive*  To attempt to mislead or deceive by talking nonsense. *interjection*  Used to express extreme displeasure or exasperation. *The American Heritage Dictionary of the English Language*, 1992.

2. Noun: 1. *Vulgar Slang* Foolish, deceitful, or boastful language.  2.  Something worthless, deceptive, or insincere.  3.  Insolent talk or behavior. [additional forms same as above definition] *The American Heritage Dictionary of the English Language*, 2000 (www.bartleby.com*,* May 16, 2005).

3. *Noun, usually vulgar*:  NONSENSE: *especially*:  foolish insolent talk. *Merriam-Webster Dictionary Online (*www.m-w.com*,* May 16, 2005).

4. *Noun.*  A taboo term for talk or writing dismissed as foolish or inaccurate (slang taboo). *Transitive and intransitive verb.* 1.  a taboo term meaning to say things that are completely untrue or very foolish  2.  a taboo term meaning to try to intimidate,

deceive, or persuade somebody with deceitful or foolish talk.
*Encarta Dictionary,* 2005 (www.msn.com, May 16, 2005).[2]

5. n. nonsense, lies, or exaggeration. *v.t.* to lie or exaggerate to. *v.i.* to speak lies or nonsense. *interj. Slang (vulgar)* (used esp. to express disagreement)
*Random House Unabridged Dictionary*, 1997 (www.infoplease.com, May 16, 2005).

6. Noun, exclamation, RUDE SLANG – a lie or nonsense. Verb, RUDE SLANG – to tell lies to (someone), esp. with the intention of persuading them of something.
*Cambridge Dictionary of American English* (www.dictionary.cambridge.org, May 16, 2005).

7. Noun – 1. (vulgar slang) lies, exaggerations, boasts, or the like. Transitive verb – 1. to lie, exaggerate, or boast to. Intransitive verb – 1. to speak lies or boast; 2. to talk idly. Interjection – 1. used to express disbelief, disgust, or the like.
(www.wordsmyth.net, May 16, 2005).

As a general rule, the Board may take judicial notice of dictionary evidence. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co*., 213 USPQ 594 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983). See also *TBMP* §704.12. The Board has a long history of taking judicial notice of definitions excerpted from print dictionaries and submitted after appeal.

---

[2] Additionally, this excerpt included the following statement entitled "Language Advisory: The dictionary entry you requested contains language that may be considered offensive."

Thus, we readily take judicial notice of definition no. 1 listed above, which is from the print version of the noted dictionary. Applicant further objects to this definition, which is recited at pp. 3-4 of the examining attorney's brief, arguing that it is available only electronically after purchase of a license and, thus, cannot be accessed by applicant. We deny the objection on this ground because, as noted, this definition is from the 1992 print edition of *The American Heritage Dictionary of the English Language* (noted *supra*).

Considering applicant's objection to the additional definitions obtained via the Internet, we find the Board's decisions in *In re Total Quality Group Inc*., 51 USPQ2d 1474 (TTAB 1999) and *In re Cyberfinancial.net, Inc*., 65 USPQ2d 1789 (TTAB 2002), to be particularly relevant.[3] In *Total Quality Group*, the Board stated its reluctance to take judicial notice of an online dictionary definition that the examining attorney specifically acknowledged did not exist in printed format and which was not submitted until after commencement of the appeal. In *Cyberfinancial.net*, the

---

[3] *Raccioppi v. Apogee Inc*., 47 USPQ2d 1368 (TTAB 1998) [in connection with a motion for summary judgment, printouts of articles downloaded from the Internet may be authenticated and introduced as evidence by means of a declaration of the person who downloaded the information] is a Board decision discussing authentication in an *inter partes* proceeding of certain evidence obtained via the Internet.

Board took judicial notice of definitions attached to the examining attorney's appeal brief, expressly acknowledging that one of the definitions was from an online resource and noting that "as indicated in the Web page printout, the *Cambridge International Dictionary of English* is available in book form."

Considering applicant's objections to the definitions obtained electronically and submitted by the examining attorney with her brief, we deny applicant's objection to definition nos. 2 - 6 (above) and take judicial notice thereof because the sources of the definitions are clearly identified even though the excerpts were downloaded from the noted Internet websites.[4] As in *Cyberfinancial.net*, the sources of definition nos. 2, 3, 5 and 6 are readily verifiable and reliable, widely-available print publications. The source of definition no. 4 is the *Encarta Dictionary* and, while it may not be available as a print publication, it is a widely-known reference that is readily available in specifically denoted editions via the Internet and CD-Rom. Thus, it is the electronic equivalent of a print publication and applicant may easily verify the excerpt. For this reason, we find it is acceptable

7

material for judicial notice even though the excerpt was submitted with the examining attorney's appeal brief.

We do not, however, take judicial notice of definition no. 7, which is excerpted from www.wordsmyth.net. The source of the definition quoted at the website is not identified on the submitted website excerpt or by the examining attorney and, thus, we can not verify it or determine its reliability. See *In re Total Quality Group Inc.*, *supra*.

*Arguments*

The examining attorney summarized her argument against registration as follows (brief pp. 3-4):

> *In re Tinseltown, Inc.*, 212 USPQ 863 (TTAB 1981) is directly on point. The Trademark Trial and Appeal Board found that the word BULLSHIT is scandalous and denied registration. It stated that "the fact that profane words may be uttered more freely in contemporary American society than was done in the past does not render such words any less profane." *[id.]* (BULLSHIT found scandalous for "accessories of a personal nature, and wearing apparel, namely: attaché cases, handbags, purses, belts, and wallets.")
> . . .
> Despite applicant's contention that the term is no longer offensive, these dictionary definitions [submitted with the brief] clearly indicate that the term is still considered scandalous in today's society. Therefore, *In re Tinseltown* is still pertinent.

---

[4] The preferable procedure would have been, of course, for the definitions and arguments in connection therewith to have been submitted during examination.

Serial No. 75788830

In support of its position, applicant submitted the following definition of "bullshit" from *WordNet 1.6* (Princeton University 1997)[5] prior to appeal:

> n:  a ludicrously false statement [syn: bull, Irish bull, horseshit, shit, crap, bunk, bunkum, guff, rot, hogwash, dogshit] v:  talk through one's hat [syn: waffle, bull, fake].

To supplement and clarify the above-quoted evidence submitted by applicant, we also take judicial notice of the definition of "bullshit" from the current edition (2.0) of *Wordnet*, available at www.wordnet.princeton.edu (January 3, 2006):

> (n) bullshit, bull, Irish bull, horseshit, shit, crap, dogshit (obscene words for unacceptable behavior) *"I put up with a lot of bullshit from that jerk"; "what he said was mostly bull"*
>
> (v) bullshit, bull, fake (talk through one's hat) "The politician was not well prepared for the debate and faked it."

Additionally, applicant submitted a copy of an essay entitled "On Bullshit" by Harry Frankfurt, a professor of philosophy at Princeton University.[6]  The essay is essentially a philosophical discourse, with often humorous

---

[5] Because it was submitted prior to appeal, we have considered this dictionary evidence that is available both for viewing and for download only online.

[6] Applicant states the essay is published at pp. 117-133 in a book by the same author entitled *The Importance of What We Care About* (Cambridge University Press 1989).

intent, on certain aspects of human communication and the connotation of the term "bullshit."[7]  Applicant contends that "a fair and objective reading of Professor Frankfurt's essay recognizes that 'bullshit' cannot be seen, at least under today's community standards, as an immoral or scandalous term"; that the essay by Dr. Frankfurt demonstrates that "bullshit" is "a subject worthy of scholarly examination"; and that the essay is "not in any sense intended to be scandalous or an affront to community standards" (brief, p. 7).

Applicant submitted, with its request for remand, evidence regarding a Showtime cable network television show entitled "Penn & Teller:  Bullshit!."  The evidence includes press releases from Showtime's own website announcing in 2003 a new series of thirteen programs.  The remaining evidence consists of excerpts from the year 2003 from various websites (e.g., valleyadvocate.com, azreporter.com, Fredericksburg.com, lasvegasweekly.com, and newhavenadvocate.com) reviewing the "Penn & Teller: Bullshit!" program series.  The following are several examples:

---

[7] Applicant requests that we take judicial notice of "scholarly reviews" at several websites of Dr. Frankfurt's essay.  This is not common factual information of the type that the Board will judicially notice and, thus, applicant's request is denied.

October 20, 2003 – SHOWTIME has renewed its multiple Emmy®-nominated series PENN & TELLER: BULLSHIT!, from the Wolper Organization, for a second season, ….  The controversial series, featuring master showmen Penn & Teller, initially premiered on SHOWTIME in January 2003.  It offers viewers an aggressive, irreverent exposé of taboo topics using the duo's trademark humor, knowledge of carnival tricks and con-artistry, as well as hidden cameras and blatant confrontation. [Showtime.com]

Penn & Teller have made a successful career out of trickery, which makes the new vaudeville magicians unlikely candidates for the roles of consumer activists.  Yet that's the role they play as the hosts, writers and producers of Bullshit, an inventive investigative series that challenges chicanery in its many forms.  In half-hour semi-documentary bursts of bravado, they look at everything from birth to death, exploring how you can get hoodwinked and screwed over every step of the way by psychics, spiritual healers, the medical profession, environmentalists and purveyors of New Age Hokum.  The difference between Penn & Teller's brand of illusion-based entertainment and trickery, they counsel, is they tell you they're lying.  [valleyadvocate.com]

While the title may give pause to viewers and advertisers, its been carefully chosen because, as Penn explains, while it's profanity, it's also legal.  Accusing performance artists of outright fraud isn't.  So to avoid lawsuits, expletives are used as (sic) rather than more socially acceptable words.  [azreporter.com]

In a silly, needless moment, [Penn] Jillette says they'll use lots of swearing and curse words to describe folks who take advantage of the public. "If we say they're lying or cheating, we could get sued," said Jillette.  "If we call them *expletive deleted*, we make the same point and stay out of court."  …
That doesn't add a lot of credibility to the series, nor does the general lack of direct

questions to those Penn & Teller accuse of perpetuating "Bullshit!" on the American public. … Though I could do without the obscenities and some of the series silliness, which pulls some of the punches, it does shine a light on the gullibility of people. [Fredericksburg.com]

Penn's advice, by the way, for protecting yourself against the various purveyors of bullshit in the world is to stay open-minded. [lasvegasweekly.com]

Applicant contends that the *Tinseltown* decision is inapposite because it is more than twenty years old and "community standards" of what constitutes immoral or scandalous matter change over time; that "'bullshit' is generally not viewed as a 'curse' of scandalous proportion, and is not generally used as a term of scatological import and significance" (brief, p. 6); and that the examining attorney has not met her burden of proving that the term "bullshit" is scandalous.

Applicant contends, further, that other registrations owned by applicant contain the word "bull" (e.g., LORD BULL, FUNKY BULL, RED BULL, BULLIONAIRE AND BULLERO) and, like the mark herein, are merely different "plays" on the word "bull." We find this argument unpersuasive. Applicant failed to submit acceptable copies of the registrations for the noted marks; rather, the marks and registration numbers are merely listed in applicant's supplemental response of November 10, 2003. While we have considered the listed

marks, this evidence is of minimal value, not only because of the form of the submission, but because these other marks owned by applicant, none of which contain the term "bullshit," are not probative of the alleged scandalousness of the particular term at issue in this case.

Applicant also contends that the registered third-party marks listed in its response of May 17, 2002, containing the term "ass" are examples of changes in "community standards" with respect to what constitutes vulgar terminology since the *Tinseltown* decision. Again, aside from the improper format in which these third-party registrations were submitted, the Board does not find this evidence to be probative of the alleged scandalousness, or lack thereof, of the term "bullshit." Thus, we also find this argument unpersuasive. *In re Nett Designs, Inc.*, 236 F.2d 1339, 57 USPQ2d 1564 (Fed. Cir. 2001). For the same reasons, applicant's mention of two pending applications, now abandoned, for marks including the term "bullshit" are of no probative value.

Finally, applicant argues that its mark "is an obvious play on the expression BULLS HIT, where a 'Hit' is a drink or, in some parlance, an inhale or ingestion of some substance – in this case one or more 'Red Bulls'" (brief, p. 12). The mark for which registration is sought is an

13

actual word and the examining attorney and applicant agree on the definition of the term. Applicant has provided absolutely no evidence supporting its statement that the term would be perceived by anyone as BULLS HIT rather than BULLSHIT; or that, if such was the case, that the phrase BULLS HIT would carry the connotation proposed by applicant. This argument is entirely unpersuasive.

*Analysis*

Registration of a mark which consists of or comprises immoral or scandalous matter is prohibited under Section 2(a) of the Trademark Act. The Court of Appeals for the Federal Circuit, in *In re Mavety Group, Ltd*., 33 F.3d 1367, 31 USPQ2d 1923 (Fed. Cir. 1994), reviewed the law regarding scandalous or immoral matter. The court noted that the burden of proving that a mark is scandalous rests with the PTO. The examining attorney must demonstrate that the mark is "shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; . . . giving offense to the conscience or moral feelings; . . . [or] calling out [for] condemnation." *In re Mavety*, 31 USPQ2d at 1925, citing *In re Riverbank Canning Co*., 95 F.2d 327, 37 USPQ 268 (CCPA 1938). The examining attorney must consider applicant's mark in the context of the marketplace as applied to the identified goods and/or services in the

14

application for registration.  Whether the mark consists of or comprises scandalous matter is to be determined from the standpoint of not necessarily a majority, but a substantial composite of the general public, and in the context of contemporary attitudes.

The examining attorney contends that the finding in *Tinseltown, supra*, that BULLSHIT is scandalous is sufficient to warrant the same finding in this case. However, we must look at the facts underlying that decision to determine, first, if it has any relevance to the case before us; and, if so, we must determine whether that 1981 finding is equally applicable today.

Neither applicant nor the examining attorney disagrees about the definition of the term "bullshit," which is defined in this record, essentially, as "ludicrously false statements, lies, exaggerations, boasts, nonsense, foolish deceitful language."  This is consistent with the definition of the same term in 1981 in *Tinseltown, supra;* and the mere fact that for some time the term has not been defined in dictionaries specifically as "bull excrement" does not render the term innocuous.  Nor does this record show that the term BULLSHIT has any other clearly innocuous definition that could be the connotation of the term in the context of these goods.  *See, e.g., In re Mavety Media*

15

*Group, Ltd*., 33 F.3d 1367, 31 USPQ2d 1923 (Fed. Cir. 1994) (BLACK TAIL for an adult entertainment magazine not scandalous based only on dictionary definitions that included both a vulgar and a non-vulgar definition of the term "tail," both of which were equally applicable in the context of the goods).

In *Tinseltown, supra*, the Board found that, in the context of the marketplace as applied to "accessories of a personal nature, and wearing apparel, namely: attaché cases, handbags, purses, belts, and wallets," the mark BULLSHIT was offensive to a substantial composite of the general public in the context of attitudes in 1981 and therefore, under Section 2(a), scandalous. It is clearly the profane connotation of the term per se, rather than a particular meaning of the term when considered in connection with goods of this nature (handbags and personal accessories), that led the Board to conclude that the term would be perceived by a substantial majority of the public as profane and, thus, the term was scandalous. *Cf. In re Riverbank Canning Co*., 37 USPQ 268 (CCPA 1938) (MADONNA held scandalous as applied to wine); and *In re Old Glory Condom Corp*., 26 USPQ2d 1216 (TTAB 1993) (flag design mark in connection with condoms found not scandalous due to

seriousness of purpose surrounding the use of applicant's mark as a campaign to prevent AIDS).

As in *Tinseltown*, there is nothing about the nature of the goods and services identified in this application, and there is no evidence of use, that gives the term a different meaning from the meaning noted above, nor does applicant contend otherwise.

In the case of *In re Boulevard Entertainment, Inc*., 334 F.3d 1336, 67 USPQ2d 1475 (Fed. Cir. 2003), the court concluded that dictionary evidence alone can be sufficient to establish scandalousness of a term that, as defined, has no other non-scandalous pertinent meaning.  The court stated the following (at 1478):

> While it is true that the personal opinion of the examining attorney cannot be the basis for a determination that a mark is scandalous, dictionary definitions represent an effort to distill the collective understanding of the community with respect to language and thus clearly constitute more than a reflection of the individual views of either the examining attorney or the dictionary editors.

The dictionary excerpts submitted by the examining attorney include the following notations by the editors: 1992 *American Heritage Dictionary of the English Language* – "obscene"; 2000 *American Heritage Dictionary of the English Language* – "vulgar slang"; 2005 *Merriam-Webster Online Dictionary* – "usually vulgar";  2005 *Encarta* – "taboo term"

and a "Language Advisory"; 1997 *Random House English Language Dictionary* – "vulgar"; and 2005 *Cambridge Dictionary of American English* – "Rude Slang."

As in *Boulevard*, applicant herein contends that the dictionary evidence does not reflect current standards as to whether the mark would be regarded as vulgar, i.e., that the conclusion in *Tinseltown* is no longer applicable to contemporary society. In this regard, the court in *Boulevard* stated the following (at 1478-1479):

> By their nature, sources of evidence of community standards are typically based on an assessment made at a particular point in time and therefore are inherently subject to objection for being outdated as time passes.
>
> . . .
>
> In order to mount a convincing challenge to a dictionary on the ground that it is outdated and therefore does not reflect current community standards, the opponent of the evidence should be expected either to present another authoritative dictionary from a later date that takes a different view of the meaning or acceptability of a word, or to make a persuasive showing through other evidence that the dictionary characterization of the term in question no longer accurately reflects commonly held views.

Applicant did not indicate whether its quoted definition from *WordNet* 1.6 (1997) included an editorial notation; however, the definition of the term in *WordNet* 2.0 (2006) labeled the term "bullshit" and several synonyms as "obscene words for unacceptable behavior." We conclude that applicant's dictionary excerpts and those which we

18

have judicially noticed may be considered contemporary and probative.  We do not agree with applicant that the labels noted in several of the more recent dictionaries (such as "usually vulgar" or "rude slang"), suggest that the term has lost its essentially vulgar connotation.  Thus, these dictionary definitions support the conclusion that the term "bullshit" is as vulgar today as it was at the time of the *Tinseltown* decision.

Similarly, we are not persuaded that applicant's evidence of uses of the term is sufficient to overcome the prima facie case established by the various dictionary excerpts and the *Tinseltown* decision.  Regarding the Penn and Teller program on the Showtime cable television network, the excerpt from the Showtime website refers to the subject matter of the show as "taboo"; and the majority of the articles[8] submitted by applicant about the show contain discussions essentially characterizing the title of the show as a profanity.

A close reading of the article by Professor Frankfurt reveals that it is in the nature of social commentary that is, at least at times, tongue-in-cheek.  Further, the

---

[8] We note, moreover, that the quoted articles are from several websites and there is no indication of the extent of exposure the public has had to these publications.

19

article itself acknowledges that the term is considered a profanity. Moreover, applicant has provided no evidence of the extent of exposure of the American public to either the Penn and Teller program or the Professor Frankfurt essay. Thus, the fact that the term "bullshit" appears therein does not rebut the case established by the examining attorney.

We note applicant's reliance on *In re Hershey*, 6 USPQ2d 1470 (TTAB 1988), which found the mark BIG PECKER BRAND for T-shirts to be not scandalous. The *Hershey* case may be distinguished from this case on its facts. In holding that the mark BIG PECKER BRAND does not offend morality or raise scandal, unlike the case before us, the Board found that the primary meanings of the word "pecker" to the general public are innocuous, rather than vulgar.

In sum, the evidence of record is sufficient to establish prima facie that the term "bullshit" is offensive to the conscience of a substantial composite of the general public and applicant's evidence does not overcome the examining attorney's prima facie showing. Therefore, we find that applicant's mark consists of or comprises scandalous matter.

**Decision**: The refusal to register under Section 2(a) of the Trademark Act is affirmed.