## In re MAVETY MEDIA GROUP LTD.

No. 93–1464.

United States Court of Appeals,
Federal Circuit.

Aug. 23, 1994.

Lawrence E. Abelman, Abelman, Frayne & Schwab, New York City, submitted for appellant. With him on the brief were Jeffrey A. Schwab and Marie A. Mastrovito.

Albin F. Drost, Deputy Sol., Office of the Sol., Arlington, VA, submitted for appellee. With him on the brief was Fred E. McKelvey, Sol.

Before CLEVENGER, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

CLEVENGER, Circuit Judge.

Mavety Media Group Ltd. appeals the May 5, 1993 decision of the Trademark Trial and Appeal Board (Board) of the United States Patent and Trademark Office (PTO) affirming the Examiner's refusal to register Mavety's trademark because it comprises immoral or scandalous matter under 15 U.S.C. § 1052(a) (1988). *In re Mavety Media Group Ltd.*, Ser. No. 74/066,893 (TTAB May 5, 1993). We vacate and remand.

I

Mavety is the publisher of *Black Tail,* an adult entertainment magazine featuring pho-

tographs of both naked and scantily-clad African–American women. On June 7, 1990, Mavety filed an application in the PTO seeking federal registration of its trademark BLACK TAIL under 15 U.S.C. § 1051(b) (1988), based on Mavety's bona fide intention to use the mark in connection with goods identified as "Magazines." On July 25, 1990, Mavety filed an Amendment to Allege Use declaring July 2, 1990 as the date of the first use of the mark. In accordance with the regulation governing the filing of an Amendment to Allege Use, Mavety provided published issues of its magazine *Black Tail. See* 37 C.F.R. § 2.76(b)(2) (1993) (requiring three specimens to support the declared date of the first use of the mark in commerce).

On November 20, 1990, the Examiner issued an Office Action requiring Mavety to identify the goods as "adult entertainment magazines" and to "disclaim the descriptive wording 'Black' apart from the mark." Despite Mavety's compliance with the Examiner's mandates on January 29, 1991, the Examiner issued a second Office Action on May 31, 1991, stating:

> [U]pon further consideration, the [Examiner] refuses registration because the mark [BLACK TAIL] consists of or comprises immoral or scandalous matter (citations omitted).

The Examiner expressly relied upon a dictionary reference defining "tail" as "SEXUAL INTERCOURSE—usu. considered vulgar." Webster's New Collegiate Dictionary 1178 (1981).

On August 15, 1991, Mavety responded to the second Office Action by contending that "[c]onsidering the more popular meanings of TAIL and BLACK TAIL ..., a substantial composite of the population would not interpret the mark to be a reference to sexual intercourse." In particular, Mavety argued that the primary sense of "tail" in the dictionary cited by the Examiner is "the rear end," a meaning not usually considered vulgar. Mavety asserted that as used in the mark BLACK TAIL on the identified magazines, "tail" suggests a woman's rear end. The magazine specimens of record illustrated Mavety's contention, depicting the use of the mark, for example, on the magazine cover

above a photograph of a woman displaying, *inter alia,* her derriere. Mavety also provided newspaper articles to support its assertion that "a large number of consumers would interpret BLACK TAIL as a reference to a type of evening coat or the full evening dress worn by men at formal occasions." Such a connotation would suggest the quality, class and experience of an expensive lifestyle, consistent with the familiar genre of adult entertainment magazines such as *Playboy* and *Penthouse.* Mavety also argued that the federal trademark register contained numerous marks consisting of words with non-sexual primary meanings that nonetheless had sexual connotations. To illustrate, Mavety included a slang dictionary reference showing almost two pages of sexual innuendos of "occupy." Slang and Euphemism 291–93 (1982). Mavety therefore urged the Examiner not to conclude that the mark BLACK TAIL would necessarily evoke the vulgar connotation of "tail" in the minds of a substantial composite of the general public, especially given the existence of at least two common non-vulgar meanings of "tail" that could also be evoked in this context.

A final Office Action issued on November 14, 1991, continuing to refuse registration of Mavety's trademark BLACK TAIL. The Examiner stated:

> The record reflect[s] the current attitudes of the term tail as Webster's Ninth New Collegiate Dictionary (1990) defines it as a female sexual partner-USU. considered vulgar. The mere fact that tail is defined in this context is very persuasive as to [the] issue involve[d], for it can be assume[d] that a substantial composite of the general public would have reason to consult a dictionary and as such become aware of new definitions of words which may in the past [have] had slang meanings but now are defined in such standard dictionaries.

In its request for reconsideration, Mavety submitted examples from the federal trademark register of marks containing "tail" and marks containing words with sexual connotations. The Examiner rejected Mavety's request for reconsideration on May 14, 1992. Mavety thus appealed to the Board.

## II

In a 2–1 decision, the Board affirmed the Examiner's refusal to register Mavety's trademark BLACK TAIL. *In re Mavety Media Group Ltd.*, slip op. at 13. In addition to the dictionary references that the Examiner made of record, the majority took judicial notice of the respective definitions of "tail" from six additional dictionary sources, four of which were slang dictionaries. Both the dissent in the Board decision and Mavety in its briefs before this court challenged the propriety of judicial notice of slang dictionaries because the accuracy of such sources are subject to reasonable dispute. *Id.*, slip op. at 15 (Simms, Member, dissenting). We need not decide whether judicial notice of slang dictionaries is proper, however, because the majority in the Board decision clearly stated that "even in the absence of the slang dictionary evidence, we would affirm the refusal on the basis of the evidence made of record by the [Examiner]." *Id.*, slip op. at 6 n. 5. Furthermore, even if reference to the additional dictionaries cited by the Board constitutes error, the error is harmless. The additional sources teach nothing beyond that already made clear by the Examiner's dictionary citation, namely, that one of the many meanings of "tail" was usually considered vulgar.

Based solely on the dictionary definitions it cited, the Board concluded:

> [T]he mark BLACK TAIL essentially conveys, in vulgar terms, the idea of African–American women as sexual objects. This innuendo is an affront to a substantial composite of the general public. Although we believe that women in general and African–American women in particular would be especially offended by the mark, we think that others, including a substantial number of men, likewise would be offended. In looking at the mark in the context of contemporary attitudes, we are mindful of the heightened public awareness and social consciousness of women's issues. Although we live in liberal times and recognize that marks which [would] have been found to be scandalous in the past hardly would raise an eyebrow today, we are convinced that a substantial composite of the general public would find the mark to be "offensive," "disreputable," "disgraceful to reputation," and shocking to their "sense of decency or propriety."

*Id.*, slip op. at 10. Mavety timely appealed the Board decision to this court.

## III

On appeal, Mavety contends that the Board erred in refusing registration based on its incorrect conclusion that the trademark BLACK TAIL comprises scandalous matter under 15 U.S.C. § 1052(a).* Specifically, Mavety challenges the propriety of such a conclusion based solely on the evidence of various dictionary definitions of "tail." In addition, Mavety argues that § 1052(a) is a facially unconstitutional abridgement of Mavety's freedom of speech guaranteed by the First Amendment, or alternatively that the Board applied § 1052(a) in an unconstitutionally arbitrary manner. For the following reasons, we hold that the Board erred in concluding that the mark BLACK TAIL comprises scandalous matter based solely on the evidence of record. In addition, we reject Mavety's challenges to § 1052(a) as unconstitutional on its face or as applied.

---

* Section 1052 provides in pertinent part:

> No trade-mark ... shall be refused registration on the principal register on account of its nature unless it—
>
> (a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute.

15 U.S.C. § 1052 (1988). The Examiner refused to register Mavety's mark BLACK TAIL because it comprised both scandalous and immoral matter. In light of its determination that the mark comprised scandalous matter, however, the Board chose not to decide whether the mark also comprised immoral matter. The Board noted that refusals to register under § 1052(a) have concentrated almost exclusively upon whether a mark comprised scandalous matter. *Id.*, slip op. at 2 n. 2 (citing *In re McGinley*, 660 F.2d 481, 484 n. 6, 211 USPQ 668, 672 n. 6 (CCPA 1981) ("We note the dearth of reported trademark decisions in which the term 'immoral' has been directly applied.")). Mavety's appeal thus does not concern whether its mark comprises immoral matter.

## IV

The determination that a mark comprises scandalous matter is a conclusion of law based upon underlying factual inquiries. *Cf. Frederick Gash, Inc. v. Mayo Clinic*, 461 F.2d 1395, 1397, 174 USPQ 151, 152 (CCPA 1972) ("The inquiry under [15 U.S.C. § 1052(a) ] is similar to that under ... 15 U.S.C. § 1052(d), which is likelihood of confusion of the marks as applied to the respective goods and/or services."); *Weiss Assocs., Inc. v. HRL Assocs. Inc.*, 902 F.2d 1546, 1547–48, 14 USPQ2d 1840, 1841 (Fed.Cir.1990) ("The likelihood of confusion is a question of law to be decided by the court. This court must accept the [Board's] factual findings unless they are clearly erroneous." (citations omitted)). Therefore, while we review the Board's underlying fact findings for clear error, we review *de novo* the Board's ultimate legal conclusion of scandalousness.

The PTO has the burden of proving that a trademark falls within a prohibition of § 1052. *See In re Standard Elektrik Lorenz Aktiengesellschaft*, 371 F.2d 870, 873, 152 USPQ 563, 566 (CCPA 1967). In order to prove that Mavety's mark BLACK TAIL is scandalous, the PTO must demonstrate that the mark is "shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; ... giving offense to the conscience or moral feelings; ... [or] calling out [for] condemnation." *In re Riverbank Canning Co.*, 95 F.2d 327, 328, 37 USPQ 268, 269 (CCPA 1938) (citations omitted). The PTO must consider the mark in the context of the marketplace as applied to only the goods described in Mavety's application for registration. *In re McGinley*, 660 F.2d 481, 485, 211 USPQ 668, 673 (CCPA 1981). Furthermore, whether the mark BLACK TAIL, including innuendo, comprises scandalous matter is to be ascertained (1) from "the standpoint of not necessarily a majority, but a substantial composite of the general public," *id.*, 660 F.2d at 211 USPQ at 673, and (2) "in the context of contemporary attitudes," *In re Old Glory Condom Corp.*, 26 USPQ2d 1216, 1219 (TTAB 1993).

Therefore, even if the members of this panel personally find the mark BLACK TAIL disgustingly scandalous, the legal conclusion that a trademark comprises scandalous matter must derive from the perspective of the substantial composite. To be sure, appellate judges are a part of the composite of the general public, but they represent only a tiny fraction of the whole, which necessarily encompasses a wondrous diversity of thought. Although constantly at odds, progressive views and conservative or traditional thinking participate alike in the formation of the composite of the general public. While we recognize the inherent difficulty in fashioning a single objective measure like a substantial composite of the general public from the myriad of subjective viewpoints, we are duty bound to apply the standard set forth by our predecessor court. *See McGinley*, 660 F.2d at 487, 211 USPQ at 674–75 (Rich, Baldwin, JJ., dissenting) (criticizing the judicial creation of the substantial composite of the general public standard as nonsensical and unsupported by the authority cited by the majority).

In addition, we must be mindful of ever-changing social attitudes and sensitivities. Today's scandal can be tomorrow's vogue. Proof abounds in nearly every quarter, with the news and entertainment media today vividly portraying degrees of violence and sexual activity that, while popular today, would have left the average audience of a generation ago aghast. To appreciate the extreme changes in social mores over time, one need only glance at a historical survey of Board decisions regarding refusals to register marks containing particular words deemed scandalous. *Compare In re Old Glory Condom Corp.*, 26 USPQ2d 1216 (TTAB 1993) (OLD GLORY CONDOM CORP, with stars and stripes design on condoms suggesting the American flag, not scandalous); *In re In Over Our Heads Inc.*, 16 USPQ2d 1653 (TTAB 1990) (MOONIES on dolls, whose pants can be dropped to expose their buttocks, not scandalous); *In re Hershey*, 6 USPQ2d 1470 (TTAB 1988) (BIG PECKER BRAND on T-shirts not scandalous); *In re Leo Quan Inc.*, 200 USPQ 370 (TTAB 1978) (BADASS for bridges of stringed musical instruments not scandalous); *In re Madsen*, 180 USPQ 334 (TTAB 1973) (WEEK–END SEX on magazines not scandalous); *In re*

*Hepperle*, 175 USPQ 512 (TTAB 1972) (ACAPULCO GOLD on suntan lotion not scandalous); *Ex parte Parfum L'Orle, Inc.*, 93 USPQ 481 (Pat. Off. Exam'r–in–Chief 1952) (LIBIDO on perfumes not scandalous) *with In re Tinseltown, Inc.*, 212 USPQ 863 (TTAB 1981) (BULLSHIT on personal accessories scandalous); *In re Runsdorf*, 171 USPQ 443 (TTAB 1971) (BUBBY TRAP for brassieres scandalous); *In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*, 159 USPQ 275 (TTAB 1968) (MESSIAS on wine and brandy scandalous); *In re Reemtsma Cigarettenfabriken G.m.b.H.*, 122 USPQ 339 (TTAB 1959) (SENUSSI on cigarettes scandalous); *In re P.J. Valckenberg, GmbH*, 122 USPQ 334 (TTAB 1959) (MADONNA on wine scandalous); *Ex parte Summit Brass & Bronze Works, Inc.*, 59 USPQ 22 (TTAB 1943) (AGNUS DEI on metallic tabernacle safes scandalous); *In re Riverbank Canning Co.*, 95 F.2d 327, 37 USPQ 268 (CCPA 1938) (MADONNA on wine scandalous); *Ex parte Martha Maid Mfg. Co.*, 37 USPQ 156 (Comm'r Pats.1938) (QUEEN MARY on women's underwear scandalous).

## V

■ In this case, the record is devoid of factual inquiry by the Examiner or the Board concerning the substantial composite of the general public, the context of the relevant marketplace, or contemporary attitudes. Based solely on the respective definitions of "tail" from dictionary sources, the Board expressed that it "harbor[ed] no doubt that BLACK TAIL is offensive to one's sense of propriety, is degrading to women, and, therefore, is scandalous." *In re Mavety Media Group Ltd.*, slip op. at 13. Such reliance on the dictionary meanings of words to establish whether a mark constitutes scandalous matter under § 1052(a), however, is not new to the Board. On at least two previous occasions, the Board has deemed dictionary definitions alone sufficient to satisfy the requirements for § 1052(a) prohibition set forth in *In re Riverbank Canning Co.*, 95 F.2d at 328, 37 USPQ at 269, and *In re McGinley*, 660 F.2d at 485, 211 USPQ at 673, the only two precedential decisions ever to address the refusal to register marks comprising scandalous matter. The first of the two previous

Board decisions to rule as a matter of law based solely on a dictionary reference was *In re Runsdorf*, 171 USPQ 443 (TTAB 1971).

In *Runsdorf*, the Board affirmed the Examiner's refusal under § 1052(a) to register the mark BUBBY TRAP for brassieres because the mark "would be offensive to public or individual sense of propriety or morality." *Id.* at 443. The Examiner's refusal was based solely on a dictionary definition of "bubby" as "Breast, now often considered vulgar." *Id.* (citing Webster's Third New International Dictionary 287 (1968)). The Board opined that "[v]ulgar, as defined, means, inter alia, lacking in taste, indelicate, morally crude, and can, in our opinion, be encompassed by the term scandalous matter." *Id.* at 444 (quoted with approval in *McGinley*, 660 F.2d at 486, 211 USPQ at 673). In *Runsdorf*, however, no alternate, non-vulgar definition of "bubby" was applicable to the word as used in the context of brassieres. While the dictionary relied upon by the Board in *Runsdorf* alternately defined "bubby" as "little boy: BROTHER—used chiefly as a familiar or affectionate term of address," there was apparently no dispute that in the context of brassieres this alternate definition was inapplicable.

The second Board decision to rely similarly on a dictionary reference is *In re Tinseltown, Inc.*, 212 USPQ 863 (TTAB 1981). In that case, the Board affirmed the Examiner's refusal under § 1052(a) to register the mark BULLSHIT for personal accessories such as attache cases, handbags, purses, belts and wallets. The application for registration was motivated by a desire to market goods to "sophisticated" clients in expensive shops located in major cities and swank resorts, satirizing competing "signature series" personal accessory products bearing patterned displays of initials corresponding to well-known designer names such as Gucci (GC), Hermes (H) and Saks Fifth Avenue (SFA), that suggest the owner's social status. *Id.* at 864 & nn. 3–4.

The Board rejected the applicant's argument that the inclusion of "bullshit" in a contemporary standard dictionary demonstrated that "bullshit" had attained a respect-

able, non-profane status. *Id.* at 866. The Examiner had relied on the dictionary's editorial label of "usu. considered vulgar" in concluding that the mark BULLSHIT comprised scandalous matter under § 1052(a). *Id.* at 864. Each definition of "bullshit" in the dictionary source cited by the Board, however, carried the editorial label of "usu. considered vulgar." Webster's Third New International Dictionary 294 (1976).

That situation, however, is not the case here. In addition to the vulgar definitions of "tail," the standard dictionaries cited by the Examiner and the Board in this case also set forth non-vulgar definitions of "tail," such as buttocks or the hindmost or rear end, that are equally applicable to define "tail" in the context of an adult entertainment magazine. The Board's conclusion that "[r]ather than as a 'playful' reference to the buttocks of an African–American woman, the mark would be viewed as a purely vulgar, sexual reference to African–American women as sexual objects" simply has no basis in the record. *In re Mavety Media Group Ltd.,* slip op. at 11.

The *Runsdorf* case tellingly highlights the inherent fallibility in defining the substantial composite of the general public based solely on dictionary references. While a standard dictionary may indicate how the substantial composite of the general public defines a particular word, the accompanying editorial label of vulgar usage is an arguably less accurate reflection of whether the substantial composite considers the word scandalous. Such labels are subject not only to differences in opinion among the respective publication staffs of particular dictionaries, but also to the potential anachronism of those opinions.

In *Runsdorf,* the dictionary sources cited to the Board were not uniform in the editorial labels accompanying their respective definitions of "bubby" as a woman's breast. *See* 171 USPQ at 443 & n. 2 (noting that The Oxford Universal Dictionary on Historical Principles (1937) makes no reference to vulgar usage in its relevant definition of "bubby"). In addition, editorial opinions regarding vulgarity of "bubby" have changed dramatically. The dictionary publisher G. & C.

Merriam Co. first stated that the definition of "bubby" as a woman's breast was "[n]ow vulgar." Webster's New International Dictionary 284 (1932). When cited in *Runsdorf,* G. & C. Merriam Co. had amended its editorial label to "now often considered vulgar." Webster's Third New International Dictionary 287 (1968). In more recent times, G. & C. Merriam Co.'s descendant, Merriam–Webster Inc., began to designate "bubby" as a variant of "booby" and further amended its editorial label to "sometimes considered vulgar." Webster's Ninth New Collegiate Dictionary 167 (1985). Such striking inconsistencies in editorial usage notes belie the trust and faith we routinely accord definitions provided by standard dictionaries.

Armed with only personal opinions and dictionary sources, the Board concluded that the mark BLACK TAIL "is an affront to a substantial composite of the general public." *In re Mavety Media Group Ltd.,* slip op. at 10. Were we simply to ignore editorial usage labels in the dictionary references cited by the Board, we would have to agree with the dissent that the majority had "essentially nothing but speculation about how this term would be perceived by the public." *Id.,* slip op. at 19 (Simms, Member, dissenting). We need not decide, however, whether a standard dictionary definition and its accompanying editorial designation of vulgarity conclusively demonstrates that a substantial composite of the general public considers that word scandalous.

Even if a standard dictionary definition and its editorial label of vulgar usage show that a substantial composite of the general public would consider the word to be scandalous, we still would hold that based solely on the dictionary sources, the Board erred in this particular case in concluding that the mark BLACK TAIL comprises scandalous matter. As we stated, in addition to the vulgar definitions of "tail," the standard dictionaries cited by the Examiner and the Board in this case also set forth non-vulgar definitions of "tail," such as buttocks or the hindmost or rear end, that are equally applicable to define "tail" in the context of an adult entertainment magazine. In view of the existence of such an alternate, non-vulgar

definition, the Board, without more, erred in concluding that in the context of the adult entertainment magazine, the substantial composite of the general public would necessarily attach to the mark BLACK TAIL the vulgar meaning of "tail" as a female sexual partner, rather than the admittedly non-vulgar meaning of "tail" as rear end. In the absence of evidence as to which of these definitions the substantial composite would choose, the PTO failed to meet its burden of proving that Mavety's mark is within the scope of § 1052(a) prohibition.

We therefore leave for another day the resolution of whether a standard dictionary definition and an accompanying editorial designation of vulgarity alone sufficiently demonstrates that a substantial composite of the general public considers that word scandalous, and consequently, whether the PTO may refuse under § 1052(a) to register a mark based solely on such standard dictionary evidence. Of course, the PTO may discharge its burden of proving that Mavety's mark BLACK TAIL is scandalous under § 1052(a) through evidence such as consumer surveys regarding the substantial composite of the general public. However, we note the view of our predecessor court that the § 1052(a) prohibition against scandalous marks is not "an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government." *McGinley*, 660 F.2d at 486, 211 USPQ at 674. We therefore commend the practice adopted by the Board in another case to resolve the issue whether a mark comprises scandalous matter under § 1052(a) "in favor of [the] applicant and pass the mark for publication with the knowledge that if a group does find the mark to be scandalous . . ., an opposition proceeding can be brought and a more complete record can be established." *In re In Over Our Heads Inc.*, 16 USPQ2d at 1654–55; *cf. In re Gourmet Bakers, Inc.*, 173 USPQ 565, 565 (TTAB 1972) (noting that where "no easy applicable objective test" exists to determine whether a mark is merely descriptive or merely suggestive, the frequent manner of disposition is resolution in favor of the applicant on the theory that any person believed damaged by the

registration would have the opportunity to oppose registration and present evidence usually not present in the *ex parte* application). Moreover, the Board has held that under 15 U.S.C. § 1063(a) (1988), any person who *believes* that he would be damaged by registration of a mark upon the principal register, thus including interested members of the composite of the general public, has standing to challenge registration in an opposition proceeding. *See Bromberg v. Carmel Self Serv., Inc.*, 198 USPQ 176, 178–79 (TTAB 1978) (opposition proceeding brought by two women against registration of the mark ONLY A BREAST IN THE MOUTH IS BETTER THAN A LEG IN THE HAND for restaurant services). Indeed, such a procedure establishes a meaningful opportunity for response by the applicant with evidence that a substantial composite of the general public would not consider the mark at issue scandalous in the context of contemporary attitudes and the relevant marketplace. *See In re Mavety Media Group Ltd.*, slip op. at 16 (Simms, Member, dissenting) (noting that Mavety "simply had no opportunity to present its arguments on the question of whether the public may view its mark in the way that the majority believes that the public might").

## VI

Finally, our precedent forecloses Mavety's challenges to § 1052(a) as unconstitutional on its face or as applied. *See McGinley*, 660 F.2d at 484, 211 USPQ at 672 ("With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark." (citations omitted)). The court also rejected McGinley's contentions that when applied to concrete cases, the statutory test for § 1052(a) prohibition of scandalous matter is so vague as to arbitrarily violate its constitutional rights to due process of law. *Id.*, 660 F.2d at 484, 211 USPQ at 672. We are thus obligated to reject Mavety's similar constitutional arguments.

## VII

For the reasons stated, we vacate the decision of the Board affirming the Examiner's refusal to register Mavety's mark BLACK TAIL and remand the case to the Board for further proceedings. The Board may seek to adduce factual support for its conclusion that the mark comprises immoral or scandalous matter, or simply pass the mark for publication to permit interested members of the public to demonstrate through an opposition proceeding that a substantial composite of the general public would consider the mark scandalous.

*VACATED AND REMANDED.*