# United States Court of Appeals for the Federal Circuit

---

**IN RE MARSHA FOX**

---

2012-1212

(Serial No. 76/315,793)

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

---

Decided: December 19, 2012

---

MICHAEL B. BRESSMAN, Vanderbilt Legal Clinic, of Nashville, Tennessee, argued for appellant.

THOMAS L. CASAGRANDE, Associate Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for appellee. With him on the brief were RAYMOND T. CHEN, Solicitor, and CHRISTINA J. HIEBER, Associate Solicitor.

---

Before DYK, PROST, and O'MALLEY, *Circuit Judges.*

DYK, *Circuit Judge.*

Marsha Fox appeals from a decision of the Trademark Trial and Appeal Board ("Board") affirming the refusal of the examiner to register her mark. The Board concluded

that the mark was unregistrable under 15 U.S.C. § 1052(a). We affirm, holding that a mark that creates a double entendre falls within the proscription of § 1052(a) where, as here, one of its meanings is clearly vulgar.

BACKGROUND

I

Section 2 of the Lanham Act, as amended, provides that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it[] (a) [c]onsists of or comprises immoral, deceptive, or scandalous matter." 15 U.S.C. § 1052.

The prohibition on "immoral . . . or scandalous" trademarks was first codified in the 1905 revision of the trademark laws, *see* Act of Feb. 20, 1905, Pub. L. No. 58-84, § 5(a), 33 Stat. 724, 725. This court and its predecessor have long assumed that the prohibition "is not an attempt to legislate morality, but, rather, a judgment by the Congress that [scandalous] marks not occupy the time, services, and use of funds of the federal government." *In re Mavety Media Grp. Ltd.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994) (quotation marks omitted). Because a refusal to register a mark has no bearing on the applicant's ability to use the mark, we have held that § 1052(a) does not implicate the First Amendment rights of trademark applicants. *See id.*

As might be expected, what constitutes "immoral . . . or scandalous matter" has evolved over time. *See id.* at 1372. The formal legal framework, however, has remained consistent: in order to refuse a mark, "the [Patent and Trademark Office (PTO)] must demonstrate that the mark is 'shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; . . . giving offense

to the conscience or moral feelings; . . . [or] calling out [for] condemnation.'" *Id.* at 1371 (second and third alterations in original) (quoting *In re Riverbank Canning Co.*, 95 F.2d 327, 328 (CCPA 1938)). More concisely, and especially usefully in the context of this case, the PTO may prove scandalousness by establishing that a mark is "vulgar." *In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 1340 (Fed. Cir. 2003). This demonstration must be made "in the context of contemporary attitudes," "in the context of the marketplace as applied to only the goods described in [the] application," and "from the standpoint of not necessarily a majority, but a substantial composite of the general public." *Mavety*, 33 F.3d at 1371 (quotation marks omitted).

Where the meaning of a mark is ambiguous, mere dictionary evidence of a possible vulgar meaning may be insufficient to establish the vulgarity of the mark. *See id.* at 1373-74. But where it is clear from dictionary evidence "that the mark[] as used by [the applicant] in connection with the [products] described in [the] application" invokes a vulgar meaning to a substantial composite of the general public, the mark is unregistrable. *See Boulevard*, 334 F.3d at 1341.

## II

The mark at issue here has two parts: a literal element, consisting of the words COCK SUCKER, and a design element, consisting of a drawing of a crowing rooster. Since 1979, Fox has used this mark to sell rooster-shaped chocolate lollipops, which she "displays . . . in retail outlets in small replicas of egg farm collecting baskets to emphasize the country farmyard motif." Appellant's Br. 6 (quotation marks omitted). The consumers targeted by Fox's business are, primarily, fans of the University of South Carolina and Jacksonville State

University, both of which employ gamecocks as their athletic mascots.

In September 2001, Fox applied to register her mark for use in connection with "[c]hocolate suckers molded in the shape of a rooster." J.A. 14. On her application form, she indicated the literal portion of the mark as "Cock-Sucker." J.A. 16. In December 2001, the PTO examiner determined that the mark "consists of or comprises immoral or scandalous matter," and is therefore unregistrable under § 1052(a). J.A. 21. Specifically, the examiner found that a dictionary defined "cocksucker" as "someone who performs an act of fellatio." *Id.* (quotation marks and ellipsis omitted).

In June 2002, Fox filed a response, noting that that "Webster's Dictionary defines . . . a cock as a rooster, and . . . a sucker as a lollipop," and asserting that these non-vulgar definitions, which match both the product design and the design element of the mark, are "more relevant" than the vulgar definition. J.A. 25. In December 2002, the PTO suspended further action on Fox's application, pending disposition of a potentially conflicting trademark application.

In July 2008, after the conflicting mark was abandoned, the PTO issued a final refusal. The examiner conceded that Fox had presented "evidence potentially supporting an equally relevant non-scandalous meaning," but concluded that "due to the strong meaning of 'cocksucker' in society in general," a "substantial composite of the general public will . . . assign the scandalous meaning to the wording/mark." J.A. 37.

Fox filed a motion for reconsideration, in which she clarified that "the intended term to be trademarked was COCK SUCKER [(with a space)], not COCKSUCKER," and included a revised image of her mark in which the

two words were clearly separated. J.A. 65. Fox protested that by "driv[ing the words] together," the examiner had "stripp[ed] the mark of any possibility of double entendre from which the relevant humor of the mark is derived," and also reiterated that the rooster design was intended to "guid[e] the potential purchaser to the less risqué of the two definitions." J.A. 65.

In August 2009, the examiner responded, noting that "COCK is defined . . . as '*penis*,' and SUCKER as, '*one that sucks*,'" and that both words are considered vulgar "as used in context." J.A. 121 (emphasis in original). Conceding that this vulgar meaning is not the primary meaning of "cock," the examiner asserted that "taking COCK in context with SUCKER, the primary meaning of this wording as a whole is 'one who sucks a penis,'" and that "the strong and commonly known meaning of COCKSUCKER in the general public" ensures that the two component words, when used together, will "unequivocal[ly]" assume their vulgar meanings. J.A. 122. The examiner continued the refusal, however, to allow Fox to respond to several questions.

In her May 2010 response, Fox argued that her proposed definitions of the disputed terms ("rooster" and "lollipop," respectively) would be "*more relevant*" than those put forward by the examiner. J.A. 155 (emphasis in original). Fox also argued at length that in light of contemporary attitudes, the mark was not vulgar.

In a final office action in May 2011, the examiner reiterated the view that "the widely known and strong unitary meaning of 'cocksucker' in society would lend [the meaning 'penis sucker'] to the individual . . . wordings COCK & SUCKER as opposed to the 'rooster lollipop' meaning." J.A. 170.

Fox appealed to the Board, which affirmed the exam-

iner's refusal. In her brief, Fox once again did not argue that the examiner's proposed definition was entirely inapposite, but rather asserted that the non-vulgar definition was, "in [her] opinion, *more relevant*" in light of consumer perceptions of "the product as a whole." J.A. 182 (emphasis in original). The Board concluded that "[t]he word portion of applicant's mark . . . , when used in connection with applicant's products, creates a double entendre[, where] one meaning is one who performs fellatio[] and the other meaning is a rooster lollipop." J.A. 6. The Board noted that "[t]he term 'Cocksucker' is uniformly identified as a vulgar term in dictionaries," and "g[a]ve very little weight to [Fox's] argument [that] COCK SUCKER has a different meaning than COCKSUCKER." J.A. 7. The Board concluded that "the evidence supports the fact that the term COCK SUCKER is vulgar and, therefore, is precluded from registration under [§ 1052(a)]." J.A. 8.

Fox timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## DISCUSSION

"The determination that a mark comprises scandalous matter is a conclusion of law based upon underlying factual inquiries." *Mavety*, 33 F.3d at 1371. Factual findings of the Board are reviewed for the presence of substantial evidence, *In re Coors Brewing Co.*, 343 F.3d 1340, 1343 (Fed. Cir. 2003), while its ultimate conclusion as to registrability is reviewed de novo. *Mavety*, 33 F.3d at 1371. The burden of proving that the proposed mark is unregistrable under 15 U.S.C. § 1052(a) rests on the PTO. *Id.*

### I

Fox first argues that the Board lacked substantial

evidence to support its finding that her mark has a vulgar meaning. Properly interpreted, Fox argues, the literal element of her mark means *only* "rooster lollipop."

This argument is without merit. As an initial matter, Fox concedes that "cocksucker" is a vulgar term in its common usage, and the dictionary evidence is devoid of an alternate, non-vulgar definition for that word.[1] Fox urges, however, that "[i]n the present case, the space between the words makes all the difference." Reply Br. 10. However, Fox concedes that a mark's "sound" is central to its "commercial impression" for purposes of § 1052. *See* Appellant's Br. 32 (citing *Palm Bay Imps. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005)). Fox, moreover, has admitted that her mark at least in part has a vulgar meaning. She acknowledged that "the . . . humor of the mark is derived" from "[the] possibility of [a] double entendre," consisting of a vulgar and a non-vulgar meaning. *See* J.A. 181; *see also* Appellant's Br. 25 n.1. At oral argument, she conceded that her mark, if used to sell sweaters, would be unregistrable as vulgar. We think that the Board did not err in concluding that the distinction between COCKSUCKER and COCK SUCKER is a distinction

---

[1] The American Heritage Dictionary defines "cocksucker" as "[o]ne who performs an act of fellatio" or "[a] mean or despicable person," and indicates that the word is "[v]ulgar [s]lang" in either use. *The American Heritage Dictionary of the English Language* 355 (5th ed. 2011). We also note that "cocksucker" is one of the famous "seven dirty words" found by the Supreme Court to be generally "indecent." *See FCC v. Pacifica Found.*, 438 U.S. 726, 738-41, 751 (1978). While the statutory contexts are different, and while the determination under § 1052(a) must be made "in the context of contemporary attitudes," *Boulevard*, 334 F.3d at 1340, this determination lends credibility to the Board's finding that "cocksucker" is a vulgar term.

without a difference. So too the association of COCK SUCKER with a poultry-themed product does not diminish the vulgar meaning—it merely establishes an additional, non-vulgar meaning and a double entendre. This is not a case in which the vulgar meaning of the mark's literal element is so obscure or so faintly evoked that a context that amplifies the non-vulgar meaning will efface the vulgar meaning altogether. Rather, the mark is precisely what Fox intended it to be: a double entendre, meaning both "rooster lollipop" and "one who performs fellatio."

## II

Next, Fox argues that even if the mark is found to have a vulgar meaning, our precedent affords the mark special solicitude as a double entendre.[2] In particular, Fox argues that when a mark is a double entendre, with one vulgar and one non-vulgar meaning, the PTO must demonstrate that the public would "choose" the non-vulgar meaning. We believe that Fox misreads our precedent.

As an initial matter, there is no requirement in the statute that a mark's vulgar meaning must be the only relevant meaning—or even the most relevant meaning. Rather, as long as a "substantial composite of the general

---

[2] The Board defined a "double entendre" as "a term that has . . . a double meaning[, or] a word or expression used in a given context so that it can be understood in [two] ways, esp[ecially] when one meaning is risqué." J.A. 6 (quotation marks omitted). Fox provides a similar definition, derived from the PTO's regulations regarding merely descriptive marks: "[a] double entendre is a word or expression capable of more than one interpretation . . . [and] that has a double connotation or significance *as applied to the goods or services.*" Appellant's Br. 20 (quotation marks omitted) (emphasis, omission, and second alteration in original).

public" perceives the mark, in context, to have *a* vulgar meaning, the mark as a whole "consists of *or comprises . . . scandalous matter." See* 15 U.S.C. § 1052(a) (emphasis added); *Boulevard*, 334 F.3d at 1340. The word "comprises," at the time of the statute's enactment in 1905, meant "includes." *See Webster's Academic Dictionary* 121 (Springfield, Mass., G. & C. Merriam Co. 1895). Congress thus chose to extend the prohibition not only to marks that "[c]onsist[] of . . . scandalous matter," but also to marks that *include* scandalous matter. Fox concedes that the mark's effect as a humorous double entendre requires the consumer to "understand[]" the risqué as well as the banal meaning of the mark. Appellant's Br. 25 n.1. We therefore see no reason why the PTO is required to prove anything more than the existence of a vulgar meaning to a substantial composite of the general public in order to justify its refusal.

Nor do we agree with Fox that the precedent excludes double entendres from the statutory bar. Fox attempts to derive this rule from two of our cases: *Mavety*, 33 F.3d 1367, and *Boulevard*, 334 F.3d 1336.

In *Mavety*, the court considered the mark BLACK TAIL as applied to "an adult entertainment magazine featuring photographs of both naked and scantily-clad African-American women." *Mavety*, 33 F.3d at 1368-69. The Board affirmed the examiner's refusal to register the mark, citing a vulgar dictionary definition of "tail" as "a female sexual partner." *Id.* at 1369-70. The applicant appealed, citing the ambiguity created by the presence of two alternative, non-vulgar meanings: "a woman's rear end," and "a type of evening coat . . . worn by men at formal occasions." *Id.* The court reversed, holding that "[i]n view of the existence of . . . an alternate, non-vulgar definition" (a woman's rear end), the Board erred by refusing registration based solely on the existence of a

vulgar dictionary definition, without identifying any "[extrinsic] evidence as to which of these definitions the substantial composite would choose." *Id.* at 1373-74. Nowhere in its opinion did the court describe the constellation of meanings at issue as a "double entendre"; to the contrary, it described the different meanings as "alternate[s]." *Id. Mavety* is thus a case about ambiguous marks, and does not control a case, such as this one, in which the conceded effect of the mark is to invoke a "double meaning." *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:77 (4th ed. 2012) (describing *Mavety* as turning on the presence of "reasonable ambiguity" regarding the mark's interpretation).

In *Boulevard*, this court dealt with a situation in which the only pertinent definition of the term at issue was vulgar. *Boulevard*, 334 F.3d at 1339-40. The court upheld the Board's decision affirming the PTO's refusal, even though the PTO had relied exclusively on dictionary evidence. *Id.* at 1340-41. The court also distinguished other examples of marks approved for registration as involving "double entendres." *Id.* at 1341, 1343. *Boulevard* does not suggest, however, that a mark that includes a double entendre is exempt from the prohibition of § 1052(a) when the mark would be seen by a substantial composite of the general public as having both a vulgar and a non-vulgar meaning. *Id.* at 1341.[3]

---

[3] Fox also relies on the Board's decision in *In re Hershey*, 6 U.S.P.Q.2d 1470 (T.T.A.B. 1988). Because *Hershey* does not bind us as precedent, we do not decide whether *Hershey* supports Fox's position, or whether *Hershey* was correctly decided. To the extent, however, that *Hershey* can be read to suggest that a mark that clearly is recognizable as a double entendre is exempt

Nor could treating double entendres differently be justified in light of the statutory objectives. A double entendre is a term that has a "double meaning," or a "double connotation." *See supra* note 2. That is, in order to be a double entendre, the term must rely on the public to perceive and understand both meanings. Fox concedes as much, stating that "the essence of a double entendre" requires the consumer to "understand[] and draw[] a distinction between the [two] meanings." Appellant's Br. 25 n.1.

Nonetheless, Fox urges us to apply to vulgar double entendres the presumption of registrability applied by the PTO to double entendres one of whose meanings is merely descriptive under § 1052(e)(1). *See* TMEP § 1213.05(c) (8th ed. 2011). Apart from the fact that we are not bound by the PTO's regulations, however, we find this analogy unpersuasive. Section 1052(a)'s ban on vulgar marks is demonstrably different from § 1052(e)(1)'s prohibition on descriptive marks. Section 1052(e)(1), unlike § 1052(a), omits the words "or comprises," and further specifies that a mark must be "*merely* descriptive." § 1052(e)(1) (emphasis added). Thus, § 1052(e)(1) is inapplicable if any one of the meanings is not merely descriptive.

We recognize that there are "whimsical" and humorous aspects to Fox's mark. *See* Appellant's Br. 43. But the fact that something is funny does not mean that it cannot be "scandalous." Indeed, the Supreme Court in *Pacifica*, in determining that the use of the word "cocksucker" is generally patently "indecent" under 18 U.S.C. § 1464, made a point of noting that "[t]he transcript of [humorist George Carlin's] recording . . . indicates frequent laughter from the audience." *FCC v. Pacifica Found.*, 438 U.S. 726,

from § 1052(a) for that reason alone, that is an incorrect reading of the statute.

729 (1978).

Nothing in this decision precludes Fox from continuing to sell her merchandise under the mark at issue, or from seeking trademark protection for some other, otherwise registrable element of her product's design, dress, or labeling. If Fox is correct that the mark at issue "bring[s] [nothing] more than perhaps a smile to the face of the prospective purchaser," Appellant's Br. 43 (second alteration in original), then the market will no doubt reward her ingenuity. But this does not make her mark registrable.

## III

Finally, Fox urges that because there is doubt as to how the general public would view her mark, the court should permit the mark to be published for registration, relying on opposition proceedings under 15 U.S.C. § 1063 to bring to light any public objections to the mark. Fox is correct to note that this court has sometimes in the past suggested this approach where the registrability of the mark is uncertain. *See Ritchie v. Simpson*, 170 F.3d 1092 (Fed. Cir. 1999); *Mavety*, 33 F.3d at 1374. Here there is no uncertainty. Where, as here, the PTO has properly determined that a mark is "scandalous" within the meaning of § 1052(a), there is no obligation to publish the mark for potential opposition proceedings. Congress has empowered the PTO to serve as the first line of defense against "scandalous" marks (subject to review by the Board, this court, and, if necessary, the Supreme Court), and this court has no authority to read such a power out of existence. *Cf. United States v. Tohono O'odham Nation*, 563 U.S. __, __, 131 S. Ct. 1723, 1730 (2011) ("Courts should not render statutes nugatory through construction."). If Congress decides that this initial screening is an unwise use of the PTO's limited resources, it is, of course, free to

amend § 1052.

To reiterate, the outcome of our decision is that Fox will remain free to use her mark in commerce. She will be unable, however, to call upon the resources of the federal government in order to enforce that mark.

## CONCLUSION

We find that substantial evidence supports the Board's determination that Fox's mark, taken as a whole and in context, has a vulgar meaning that will be perceived by a substantial composite of the general public. The Board did not err in concluding that this finding is sufficient to establish that the mark "[c]onsists or comprises . . . scandalous matter" within the meaning of 15 U.S.C. § 1052(a), and is not registrable.

**AFFIRMED**