THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: 8/12/2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Star Belly Stitcher, Inc.*

_____

Serial No. 85247730

_____

Bruno Tarabichi of Owens Tarabichi,
    for Star Belly Stitcher, Inc.

Linda Lavache, Trademark Examining Attorney, Law Office 106,
    Mary I. Sparrow, Managing Attorney.

_____

Before Quinn, Ritchie and Kuczma,
    Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Star Belly Stitcher, Inc. filed, on February 21, 2011, an application under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), to register the designation **AWSHIT WORKS** (in standard characters) for "baseball caps; bucket caps; cap visors; caps; caps with visors; fleece pullovers; golf caps; golf shirts; hats; hooded pullovers; hunting vests; jackets; knit shirts; long-sleeved shirts; mock turtle-neck sweaters; neckties; pique shirts; polo shirts; scarves; short-sleeved or long-sleeved t-shirts; sports caps and hats; sweat shirts; t-shirts; visors; [and] wind shirts" in

International Class 25.[1] Applicant claims first use anywhere on July 5, 2009, and first use in commerce on July 10, 2009.

The trademark examining attorney refused registration under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that applicant's proposed mark, when used in connection with applicant's goods, comprises immoral or scandalous matter.

When the refusal was made final, applicant appealed. Applicant and the examining attorney filed briefs.

Applicant argues that the proposed mark is a fanciful term coined by applicant. Applicant further asserts that the AWSHIT portion is a unitary term, not two terms, and that the term "shit" is not used or emphasized separate and apart from AWSHIT.[2] Thus, applicant argues, the examining attorney impermissibly dissected the mark into its component parts. Applicant also asserts that because the proposed mark does not contain the separate term "shit," consumers will not recognize the mark as referring to the term "shit." Even if consumers perceive the word "shit" within the mark, and equate it with "feces," the literal interpretation of the mark, "aw feces works," makes no sense. Applicant also points to the existence of words

---

[1] Applicant depicts the applied-for mark in the drawing as "Awshit Works," claiming that its mark is in standard characters. TMEP § 807.03(a) (2013) provides that in such cases "the applicant ... may use both uppercase and lowercase letters, all uppercase letters, or all lowercase letters, since no claim is made to any *particular* font style, size, or color"; further, "applicant does not have to display the mark in all uppercase letters." (emphasis in original). Inasmuch as no claim is made in any particular font style or size, we have depicted the applied-for mark in this decision in all uppercase letters.

[2] Notwithstanding this argument, in the initial application document applicant originally disclaimed the words "SHIT" and "WORKS" apart from the mark. When the examining attorney informed applicant that the disclaimers were unnecessary, applicant withdrew the disclaimers.

such as "shitake" and "shittah," remarking that although these words begin with the letters "s-h-i-t," they are not recognized or equated with the term "shit." Applicant argues that, in any event, the term "shit" also has non-vulgar meanings. Lastly, applicant contends that the trademark register is "littered" with marks that are clearly more offensive than is its proposed mark, and that any doubts regarding whether the proposed mark is immoral or scandalous must be resolved in applicant's favor.

The examining attorney maintains that the term "shit" is offensive, and that AWSHIT is a combination that is vulgar slang for use as an interjection to express surprise, anger or extreme displeasure. The examining attorney introduced online dictionary definitions of the terms "aw," "shit," "awshit" (unitary), "aw shit" (two terms) and "works"; a newspaper article; and a summary of results when "aw shit" was searched using the Google search engine.

Section 2 of the Trademark Act, as amended, provides that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it[] (a) [c]onsists of or comprises immoral, deceptive, or scandalous matter." What constitutes "immoral" or "scandalous matter" has evolved over time, and our primary reviewing court has observed that "we must be mindful of ever-changing social attitudes and sensitivities." *In re Mavety Media Grp. Ltd.*, 33 F.3d 1367, 31 USPQ2d 1923, 1926 (Fed. Cir. 1994). As the Federal Circuit stated, "Today's scandal can be tomorrow's vogue. Proof abounds in nearly every quarter, with the

news and entertainment media today vividly portraying degrees of violence and sexual activity that, while popular today, would have left the average audience of a generation ago aghast." *Id.* During this societal evolution, however, the basic legal framework has remained consistent.

In order to refuse a mark under this portion of Section 2(a), the Office "must demonstrate that the mark is 'shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; ... giving offense to the conscience or moral feelings; ... [or] calling out [for] condemnation.'" *In re Mavety Media Grp. Ltd.*, 31 USPQ2d at 1926. More concisely, and especially useful in the context of this case, the Office may prove scandalousness by establishing that a mark is "vulgar." *In re Fox*, 702 F.3d 633, 105 USPQ2d 1247, 1248 (Fed. Cir. 2012), *citing In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 67 USPQ2d 1475 (Fed. Cir. 2003). *See In re Runsdorf*, 171 USPQ 443, 444 (TTAB 1971) (the statutory language "scandalous" has been considered to encompass matter that is "vulgar," defined as "lacking in taste, indelicate, morally crude"). This demonstration must be made "in the context of contemporary attitudes," "in the context of the marketplace as applied to only the goods described in [the] application," and "from the standpoint of not necessarily a majority, but a substantial composite of the general public." *In re Mavety Media Grp. Ltd.*, 31 USPQ2d at 1925-26.

Where the meaning of a proposed mark is ambiguous, mere dictionary evidence of a possible vulgar meaning may be insufficient to establish the vulgarity of the mark. *In re Fox*, 105 USPQ2d at 1248 (citations omitted). But where it is clear from

dictionary evidence "that the mark[] as used by [the applicant] in connection with the [products] described in [the] application" invokes a vulgar meaning to a substantial composite of the general public, the mark is unregistrable. *Id.* Whether applicant intended the mark to be humorous, or even whether some people would actually find it to be humorous, is immaterial. *In re Luxuria, s.r.o.*, 100 USPQ2d 1146, 1149 (TTAB 2011); *see also In re Fox*, 105 USPQ2d at 1251 ("the fact that something is funny does not mean that it cannot also be 'scandalous'").

The determination that a mark comprises scandalous matter is a conclusion of law based upon underlying factual inquiries, and the burden of proving that a proposed mark is unregistrable under Section 2(a) rests with the Office. *In re Mavety Media Grp. Ltd.*, 31 USPQ2d at 1925.

The record includes numerous dictionary entries showing that the term "shit" is uniformly defined by dictionaries in terms of being "vulgar" or "offensive." *See In re Boulevard Entm't Inc.*, 67 USPQ2d at 1478 ("While it is true that the personal opinion of the examining attorney cannot be the basis for a determination that a mark is scandalous, dictionary definitions represent an effort to distill the collective understanding of the community with respect to language and thus clearly constitute more than a reflection of the individual views of either the examining attorney or the dictionary editors."). The definitions of "shit" in one dictionary begin by indicating that the term is "offensive":

> the solid waste which is released from the bowels of a person or animal; someone or something you do not like, especially because they are unpleasant or of low quality;

insults, criticism or unkind or unfair treatment; and used
in negatives to mean "anything."
(CAMBRIDGE DICTIONARIES ONLINE).

Another dictionary lists all definitions of "shit" as being "usually vulgar": "feces, nonsense, crap, damn"; and that the term is "usually vulgar" when "used as an interjection." (MERRIAM-WEBSTER ONLINE). The definitions of "shit" listed in THE AMERICAN HERITAGE DICTIONARY at yahoo.com begin with identifying the term as "Vulgar Slang." THE OXFORD ENGLISH DICTIONARY indicates that the term "shit" is "coarse slang," meaning "expressing anger, despair, surprise, frustration, resignation, excitement, etc."

The term "aw," by contrast, is used as an interjection "to express mild sympathy, remonstrance, incredulity or disgust" (PENGUIN DICTIONARY); "to express sympathy, tenderness, disapproval or disbelief" (THE AMERICAN HERITAGE DICTIONARY); and as "an expression of disapproval, commiseration, or appeal" (COLLINS DICTIONARY).

The designation "aw shit," as a composite, is defined as follows: "something you say when something bad happens." (Urban Dictionary).[3] The term "awshit"

---

[3] Urban Dictionary (urbandictionary.com) is a slang dictionary with definitions submitted by visitors to the website. The Board has in the past considered entries from this online dictionary, comprising user-generated content, to be probative evidence. *See, e.g., In re Luxuria*, 100 USPQ2d at 1150-51. The website indicates that "[a]ll the definitions on Urban Dictionary were written by people just like you. Now's your chance to add your own!" The website further indicates that Urban Dictionary "cannot control all content posted by third parties," and that it "does not guarantee the accuracy, integrity or quality of such content," warning that a user of the website may be exposed to content that the user may find incorrect, objectionable or offensive. In referencing the dictionary definitions in the present case, we recognize the inherent problems regarding the reliability of Urban Dictionary because it is a collaborative website that permits anyone to submit or edit a definition. Thus, Urban Dictionary entries suffer from the same potential reliability problem that the Board has confronted with respect to Wikipedia. *See In re IP Carrier Consulting Group*, 84 USPQ2d 1028, 1032-33 (TTAB 2007). The Board finds that the two reference works should

(unitary) is defined in the same dictionary as follows: "Awshit is usually used when something really bad happens, or in a case of horrible shock"; and "Aw Shit!" (composite) is "normally used when running away from a bad situation; a harsher version of 'Oh No!' or 'Aw Man!'".

Finally, the term "works" is defined as "an industrial building, especially one where a lot of people are employed." (CAMBRIDGE DICTIONARIES ONLINE).

The dictionary evidence shows that the terms "shit" and "aw shit" are vulgar terms. As highlighted by the examining attorney, however, the record in this case includes more than just dictionary definitions.[4] An article from the PITTSBURGH

---

be treated similarly. Accordingly, the Board will consider dictionary definitions taken from Urban Dictionary so long as the non-offering party has an opportunity to rebut that evidence by submitting other definitions that may call into question the accuracy of the particular Urban Dictionary definitions. Our consideration of the Urban Dictionary definitions is with the recognition of the limitations inherent in this dictionary, given that anyone can submit or edit the definitions. Further, in the context of a Section 2(a) refusal involving the "immoral or scandalous" portion of the statute, we recognize that while a definition in Urban Dictionary may be indicative of what a term means to a composite of the general public, we are less sure that it represents the meaning to a substantial composite, given that just one person can submit a proposed definition. In the present case, the examining attorney submitted the Urban Dictionary definitions early enough to allow applicant an opportunity to rebut this evidence if it believed that the definitions were incorrect. Here, applicant did not submit any alternative meanings of "aw shit" or otherwise question the reliability of the definitions listed in Urban Dictionary. Accordingly, we have considered the Urban Dictionary definitions. Of course, as the Board has pointed out with respect to Wikipedia evidence, the better practice with respect to such evidence is to corroborate the information with other reliable sources if available. *See* TBMP § 1208.03 (2013). The same recommendation applies equally to Urban Dictionary evidence and, in fact, the examining attorney in the present case introduced, *inter alia*, dictionary definitions from various reliable dictionary sources.

[4] The Google search result summary showing uses of the term "aw shit" is of limited probative value. These search results do not show use of the term as a heading, link or content on a website, and moreover there is insufficient text to show the context within which the term is used. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007); and *In re Thomas Nelson, Inc.*, 97 USPQ2d 1712, 1715 (TTAB 2011). While the search retrieved a large number of hits (over 100,000), this too is of limited probative value. *In re BetaBatt Inc.*, 89 USPQ2d 1152, 1153 n.1 (TTAB 2008).

POST-GAZETTE (July 19, 2006) is captioned "Bush's Expletive Wasn't Deleted." The article references an instance when former President George W. Bush casually uttered the word "shit" off the cuff, and indicates that many newspapers declined to print the word in full, and four of the major broadcast television networks edited out the word when airing the clip of the President's quote. For example, CBS stated that "we bleeped [the term 'shit'] ... [i]t's a CBS policy that we don't air expletives." The article also states that some major newspapers, including USA TODAY, printed the expletive as "S---" instead of the actual word when quoting the President. The article further indicates that those newspapers that printed the word in their editions, and those cable news outlets and radio stations that aired the quote, departed from their normal practice due to the identity of the speaker and the newsworthiness of the story. In this connection the author indicates that her paper, the PITTSBURGH POST-GAZETTE, "normally does not print obscenities"; and a CNN spokesperson is quoted as saying "[t]he word is not one we'd normally air on CNN, but when said by the President in this context, we thought it was appropriate." Other outlets, such as National Public Radio, aired the quote but only after alerting listeners by a warning that the story contained "language some may find offensive."

The examining attorney also highlights the fact that the United States Supreme Court, in a recent opinion, used the designation "s***" in place of the word "shit." *See FCC v. Fox TV Stations, Inc.*, 132 S.Ct. 2307, 2314 (2012) ("There, a person

named Nicole Richie made the following unscripted remark while presenting an award: 'Have you ever tried to get cow s*** out of a Prada purse?'").

Based upon the evidence of record, we have no trouble finding that applicant's proposed mark is scandalous as contemplated by the provisions of Section 2(a). We find that the totality of the evidence is sufficient to establish *prima facie* that the term "aw shit" is an interjection, which is scandalous or vulgar to the conscience of a substantial composite of the general public, notwithstanding the fact that contemporary attitudes toward coarse language are more liberal than they were just a generation ago. The addition of the term "works," (which may indeed be displayed in a subordinate manner to the "awshit" portion in the proposed mark as actually used (*see* specimen, *infra*)), does not serve to diminish the vulgarity of the term. *See In re Fox*, 105 USPQ2d at 1250 (design element of a crowing rooster did not diminish vulgarity of literal element "Cock Sucker"); and *Boston Red Sox Baseball Club LP v. Sherman*, 88 USPQ2d 1581 (TTAB 2008). In this case, while we need not rely solely on dictionary definitions for our decision, the term "shit" would appear to be one of those vulgar terms, by definition alone, which dooms a proposed mark under Section 2(a). So as to be clear, while we find the dictionary definitions to be sufficient, we find that there is ample evidence in the record beyond the dictionary definitions which establishes that the proposed mark is scandalous to a substantial composite of the general public.

Insofar as applicant's arguments are concerned, applicant contends that the term "shit," in addition to the meanings upon which the examining attorney relies,

has other meanings that clearly are not vulgar. In particular, applicant points to the following alternative meanings: a contemptible worthless person; something worthless, rubbish, nonsense; personal belongings, stuff; tease or try to deceive; and an exclamation of disgust, anger or annoyance.

First, "shit" is still a vulgar term used to express all of these alternative meanings highlighted by applicant; the vulgarity of the term is not diminished when used with any of them. Second, there is no requirement in Section 2(a) that a mark's vulgar meaning must be the only relevant meaning, or even the most relevant meaning. Rather, as long as a "substantial composite of the general public" perceives the mark, in context, to have *a* vulgar meaning, the mark as a whole "consists of *or comprises* ... scandalous matter." *In re Fox*, 105 USPQ2d at 1250 (emphasis in original). As explained by the Federal Circuit: "The word 'comprises,' at the time of the statute's enactment in 1905,[5] meant 'includes.' Congress thus chose to extend the prohibition not only to marks that '[c]onsist[] of ... scandalous matter,' but also to marks that *include* scandalous matter." *Id.* (citations omitted). Thus, the Office need prove the existence of only one vulgar meaning to justify a Section 2(a) refusal. *Id. See* TMEP § 1203.01 (2013).

Applicant and the examining attorney go back and forth over whether the specimen of record, reproduced below, shows the mark to be AwShit Works or Awshit Works; that is, applicant contends that the letter "s" of the "shit" portion is

---

[5] The court, earlier in the *Fox* decision, had noted that the prohibition against registration of immoral or scandalous marks that is found in the Trademark Act of 1946 was first codified in the 1905 revision of the trademark laws. *In re Fox*, 105 USPQ2d at 1248.

in lowercase (thereby making it less likely that consumers will perceive the term "shit"), whereas the examining attorney asserts that the letter "S" is in uppercase (thereby making the "shit" portion more easily discernible).



This discussion is irrelevant to our decision. Because applicant's proposed mark is presented in standard characters, as noted earlier, applicant is not limited to any particular depiction of the mark. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909-10 (Fed. Cir. 2012); and *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1847 (Fed. Cir. 2000). The rights associated with a mark in standard characters reside in the wording or other literal element, and not in any particular display. *In re White Rock Distilleries Inc.*, 92 USPQ2d 1282, 1284 (TTAB 2009). Of particular relevance in this case is that applicant, in applying for its mark in standard characters, is entitled to all depictions of its standard character mark regardless of the font style, size, or color, and not merely "reasonable manners" of depicting such mark. *See In re Viterra Inc.*, 101 USPQ2d at 1910; and *Citigroup Inc.*

*v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011). Thus, although the specimen may show the way in which applicant currently uses the proposed mark, the mark could at any time in the future be displayed in a manner emphasizing the term "shit."[6]

Applicant, while acknowledging that whether a term is immoral or scandalous necessarily must be determined on a case by case basis, nevertheless "feels compelled to point out that there are much more supposedly offensive trademarks than AWSHIT WORKS that have been allowed to register." (Brief, p. 6). Thus, applicant urges, equity requires that its proposed mark be allowed to proceed to publication.

First, while applicant specifically lists for the first time in its brief five third-party registered marks, no copies of the registrations were submitted. To make a third-party registration of record, a copy of the registration, either a copy of the paper Office record, or a copy taken from the electronic records of the Office, should be submitted during prosecution/examination of the application. *In re Jump Designs LLC*, 80 USPQ2d 1370, 1372-73 (TTAB 2006). Mere listings of registrations are not sufficient to make the registrations of record. *In re Hoefflin*, 97 USPQ2d 1174, 1177 (TTAB 2010). Second, even if copies had been submitted with applicant's brief, such evidence would be untimely. Trademark Rule 2.142(d) provides that the record in an application should be complete prior to the filing of an appeal and that the Board will ordinarily not consider additional evidence filed with the Board after the appeal

---

[6] S*ee* discussion, *infra*, regarding words that include a "shit" portion, but which would not be readily perceived as referencing the vulgar word.

is filed. Third, and most significantly, although consistent treatment under the Trademark Act is an administrative goal, the existence of third-party registrations that may be equally immoral or scandalous, or more immoral or scandalous, is not justification for the registration of another immoral or scandalous mark. "Even if all of the third-party registrations should have been refused registration ... such errors do not bind the USPTO to improperly register Applicant's marks." *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009), citing *In re Boulevard Entm't Inc.*, 67 USPQ2d at 1480. *See In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the board or this court.").

The existence of words such as "shitake" and "shittah," which applicant points out include a "shit" portion, is irrelevant.[7] As opposed to applicant's applied-for mark, in which the phrase "aw shit" would readily be seen, consumers are unlikely to even perceive or understand the letter string as referencing the vulgar word "shit," given that the words have their own recognized meanings, none of which is vulgar.

In making our determination, we have considered the Board's decision in the case of *In re Red Bull GmbH*, 78 USPQ2d 1375 (TTAB 2006) wherein the Board

---

[7] The first word referenced by applicant is a variant of the correctly spelled word "shiitake," defined as "a mushroom native to East Asia, having an edible golden or dark brown cap." The word "shittah" means "a tree, probably a species of acacia, that was a source of a wood mentioned frequently in the Bible." THE AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011). The Board may take judicial notice of dictionary definitions. *In re Thomas White Int'l Ltd.*, 106 USPQ2d 1158, 1160 n.1 (TTAB 2013).

13

found the term BULLSHIT to be vulgar. We have not relied on it, however, in rendering our decision herein. Given the possible changes in morés over time, as discussed above, we recognize that an earlier decision generally is insufficient to warrant the same finding in a later case involving the same or similar mark. *Id.* at 1381. Thus, while the earlier mark BULLSHIT and the present mark AWSHIT WORKS share the common element "SHIT," the Board's prior decision, rendered over seven years ago, is of limited value to us in this case, where there is ample, more current, evidence. *In re Mavety Media Grp. Ltd.*, 31 USPQ2d at 1926.

Applicant urges that any doubt about the registrability of its proposed mark be resolved in its favor. Although this approach has been utilized where the registrability of the mark is uncertain, here we have no uncertainty about the vulgarity of the proposed mark. *In re Fox*, 105 USPQ2d at 1251-52. Nothing in this decision, of course, precludes applicant from continuing to sell its merchandise under the proposed mark; or from uttering the vulgar portion of its proposed mark upon its receipt of this decision. "[Applicant] will be unable, however, to call upon the resources of the federal government in order to enforce [its] mark." *In re Fox*, 105 USPQ2d at 1252.

**Decision**: The refusal to register is affirmed.