THIS OPINION IS A
PRECEDENT OF THE T.T.A.B

Mailed:
September 26, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Simon Shiao Tam*

_____

Serial No. 85472044

_____

Ronald D. Coleman of Goetz Fitzpatrick, LLP for Simon Shiao Tam.

Mark Shiner, Trademark Examining Attorney, Law Office 102 (Mitchell Front, Managing Attorney).

_____

Before Rogers, Chief Administrative Trademark Judge, and Kuhlke and Taylor, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Simon Shiao Tam, seeks registration on the Principal Register of the mark THE SLANTS in standard characters for services identified as "entertainment in the nature of live performances by a musical band," in International Class 41.[1]

---

[1] Application Serial No. 85472044 was filed on November 14, 2011, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on an allegation of first use and use in commerce on November 15, 2006.

Registration has been refused under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that applicant's mark "consists of or includes matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or national symbols under Trademark Act Section 2(a)."[2] E.A. Br. p. 3.

When the refusal was made final, applicant appealed and requested reconsideration. On December 20, 2012, the examining attorney denied the request for reconsideration. Subsequently, the appeal was resumed and has been fully briefed. We affirm the refusal.

Arguments and Evidence

The examining attorney contends that THE SLANTS is a highly disparaging reference to people of Asian descent, that it retains this meaning when used in connection with applicant's services, and that a substantial composite of the referenced group finds it to be disparaging. In support of this contention the examining attorney has submitted several definitions from various dictionaries and reference works that label "slant" as a derogatory word, including the following definitions:

> Slant/Slant-eye n. a derog. Term for an Oriental person The Cassell Dictionary of Slang (1999);

> Slant 1. A derogatory term used to refer to those of Asian descent. More accurately, it tends to refer to anybody with slanted eyes. Urban Dictionary (www.urbandictionary.com);
> Slant noun US, derog. and offensive = slant-eye noun. Oxford Reference Online www.oxfordreference.com;

---

[2] This is applicant's second application for the mark THE SLANTS for nearly identical services. Application Serial No. 77952263 was also refused under Section 2(a) as disparaging. Applicant appealed that refusal to the Board, but the case was dismissed for failure to file a brief. E. A. Br. n.1; Office Action n.1 (June 20, 2012).

Slant noun a. South Asian person US 1942 Offensive <u>The New Partridge Dictionary of Slang and Unconventional English Vol. II</u> (2006) (http://books.google.com); and

[S]lant a derogatory nickname for any Oriental. From the shape of the Oriental eyes. <u>Slang and Euphemism</u> (2d abridged ed. 1991).[3]

In one of the submissions other contextual meanings are included in the

definition:

Slant n. 1. a. A line, plane, course, or direction that is other than perpendicular or horizontal, a slope, b. A sloping thing or piece of ground; 2. *Printing* A virgule; 3. a. A personal point of view or opinion, b. A bias; **4. Offensive Slang Used as a disparaging term for a person of East Asian birth or descent**. <u>The American Heritage</u>

---

[3] Other definitions from reference works and websites include:

"Slant-eye, Slant pejorative term for a person of Far Eastern origin (Chinese, Japanese, Korean, Vietnamese etc.) Derived from the term for those who have epicanthic folds." List of ethnic slurs (www.wikipedia.org);

"Slant … The noun is from 1655. Derogatory slang sense of 'Oriental, slant-eyed person' is recorded from 1943, from earlier slant-eyes (1929)." <u>Online Etymology Dictionary</u> (www.etymonline.com);

"Slant - Asians - Facial Description – referring to the eyes." Ethnic Slurs www.asianjoke.com;

"Slant, slanteye, slant-eye. A derogatory reference to Asians, based on the epicanthic fold, or flap, over the eyes of some Asian peoples, giving the eyes a slanted look." <u>The color of words: an encyclopaedic dictionary of ethnic bias in the United States</u> (1997);

"Forbidden Terminology Derogatory Racial Terms Slant refers to the perceived shape of Asian eyelids" <u>21st Century American English Compendium</u> (3rd rev. ed. 2006);

"slope and slant, slanteye(s) an East Asian [including Japanese] or Southeast Asian person having the 'oriental' epicanthic folds. (Intended and perceived as derogatory. User is considered to be racially bigoted. … )" <u>Forbidden American English</u> (1995); and

"'Jap' is a derogatory term! … And, so are terms like 'chink' … and 'slant.'" Japanese American Citizens League Anti-Hate Program www.lacl.org. "The Japanese American Citizens League is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry." www.jacl.org.

> Dictionary of the English Language retrieved from Credo Reference www.credoreference.com and Wordnik www.wordnik.com (emphasis added).

The examining attorney also included printouts from applicant's web page located at www.myspace.com/theslants, including the one depicted below:



Further, the band's entry in Wikipedia is of record and references that "The band name, The Slants, is derived from an ethnic slur for Asians." www.wikipedia.org.[4]  This entry also includes the following quote attributed to applicant:  "We want to take on these stereotypes that people have about us, like the slanted eyes, and own them.  We're very proud of being Asian – we're not going to hide that fact.  The reaction from the Asian community has been positive."

---

[4] This Wikipedia entry was attached to the First Office Action (January 6, 2012); therefore, applicant had an opportunity to rebut it. *In re Cook Medical Technologies LLC*, 105 USPQ2d 1377, 1382 n.2 (TTAB 2012); *In re Carrier Consulting Group*, 84 USPQ2d 1028, 1032-33 (TTAB 2007).  Applicant did not do so.  As will be discussed *infra*, applicant does not dispute the historical pejorative use of the term but, rather, can be characterized as intending to embrace and redefine the term.

Finally, the examining attorney submitted printouts of online articles which report that individuals representing Asian groups or in their individual capacity consider the term "slant," its plural "slants" and even specifically applicant's mark THE SLANTS to be disparaging terms. A few examples are set forth below:

A few years back, the **Oregon Commission on Asian Affairs** AND the **Asian American Youth Leadership Conference**, both LOCAL Oregon organizations, pulled support from the Slants, citing their offensive name. I've got nothing against the Slants other than their name, which is racially offensive… "bigWOWO" at www.bigwowo.com (2010) (emphasis in original);

Earlier this year, the band experienced first-hand the complex and diverse political perspectives of Asian Americans. Young[5] was initially slated to give the keynote address at the 2009 Asian American Youth Leadership Conference in Portland. But some conference supporters and attendees felt the name of the band was offensive and racist, and out of respect for these opinions the conference organizers decided to choose someone less controversial. "The Asian Reporter" (August 4, 2009);

"Young [applicant] called the new band The Slants – a name that has been controversial from the start. … It wasn't until he posted advertisements for Asian bandmates and people responded by calling him racist that Young realized the name pushed some hot buttons." The Oregonian (December 4, 2010); and

Oregon Governor Cancels Asian Band the Slants' Performance at Asian Youth Conference ... However, the OCAA withdrew support of the event because they found The Slants' name to be offensive towards the Asian community. Fearing that the action would trigger similar responses with other supporters, the AAYLC had no choice but to select an alternate speaker and cancel the band's appearance. "The Daily Swarm" http://64.34.174.165/headlines (2010);

---

[5] Applicant, Simon Shiao Tam, is also known as Simon Young. See Office Action (January 6, 2012) p. 57 (www.bigwowo.com/2011/04/the-slants-and-bigwowos-support-of-the-u-s-patent-and-trademark-office).

In response to the refusal, applicant submitted the following dictionary definition:[6]

> Slant n. 1. a. A line, plane, course, or direction that is other than perpendicular or horizontal; a slope. b. A sloping thing or piece of ground. 2. *Printing* A virgule. 3. a. A personal point of view or opinion b. a bias 4. Offensive Slang Used as a disparaging term for a person of East Asian birth or ancestry.[7]

In addition, applicant submitted four third-party registrations and an application for marks that contain the word "slant." See Reg. No. 4123704 for the mark SLANT for, *inter alia*, skateboards, water skis, surf skis, skis, snow boards; Reg. No. 3894536 for the mark SLANT for, *inter alia*, motion picture film productions, production of radio or television programs; and two marks for serving ware for serving food, the standard character mark SLANT (Reg. No. 3437230) and

the design mark  (Reg. No. 3437238).[8]

Applicant's primary contention is that his trademark has been "refused registration on the basis of Applicant's race … [and given the] failure of proof and misapplication of law, the evidentiary record does not support the PTO's conclusions

---

[6] We only include the noun definitions inasmuch as the verb definitions have less relevance to the mark THE SLANTS wherein "slants" is used as a noun, as determined by use of the definite article "the" immediately preceding the word "slants."

[7] American Heritage Dictionary of the English Language (http://ahdictionary.com May 2, 2012). Applicant also submitted the full excerpt of definitions for "slant" from the Oxford English Dictionary which includes ten different meanings with the offensive slang meaning as the last entry.

[8] The fifth example is an application (Serial No. 85269787) and, as such, is of limited probative value. *Glamorene Products Corp. v. Earl Grissmer Co., Inc.*, 203 USPQ 1090, 1092 n.5 (TTAB 1979) (an application is evidence only of its filing).

that the Application for registration of THE SLANTS should be denied." App. Br. pp. 3-4. Applicant asserts that the examining attorney failed to provide evidence that the mark is "inherently offensive" and takes issue with the examining attorney's reliance on one possible meaning of the word "slant," which resulted in the examining attorney's search parameters using the words "slant" and "derogatory" to "confirm" his refusal. App. Br. pp. 12-14.

As to the Office's evidence pertaining to applicant's services and manner of use, applicant argues that "the grounds for refusal constituted error [for] at least two reasons … (1) They improperly condition registration on the ethnic background of an applicant, and (2) they amount to an unprecedented prohibition against registration by a particular individual or group of people because of their past use of a mark." App. Br. p. 17. Specifically, applicant contends that, based on the examining attorney's logic, non-Asians would be entitled to registration of the word "slants" but Asians are not. Id. Applicant goes on to suggest that the only rebuttal to the examining attorney's refusal "would have been a submission proving that the band was not entirely Asian and hence entitled to registration, a patently offensive proposition." App. Br. p. 18. With regard to applicant's second point concerning its past use, applicant asserts that the refusal is "dependent on the identity of the person, rather than the content of the application."[9] Id.

Applicant concludes that:

The refusal, rather, is based on who the Applicant is. It follows that if anyone else on earth – Asian or otherwise – submitted an application

---

[9] The "past use" is in reference to the examining attorney's evidence of applicant's use and public perception of that use that is prior to applicant's November 14, 2011 filing date.

to register THE SLANTS that was identical to the Application here, registration would have been allowed. Concomitantly, Applicant could never register THE SLANTS no matter the content of the application.

This result would be a surprising and troubling reading of 15 U.S.C. § 1052(a), and one that is not supported by law, policy or common sense. Neither the ethnic identity of Applicant, the extent to which he associates in his use of the mark with other Asians, the degree to which he makes use of his own cultural heritage, or his identity in any sense at all should be of relevance concerning registration of THE SLANTS as a trademark for "entertainment in the nature of live performances by a musical band."

App. Br. p. 19.

Law

Registration of a mark which consists of matter which may disparage, *inter alia*, "persons," is prohibited under Section 2(a) of the Trademark Act. To determine whether a proposed mark is disparaging the Board applies the following two-part test:

1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*In re Lebanese Arak Corp,* 94 USPQ2d 1215, 1217 (TTAB 2010);[10] *In re Heeb Media LLC,* 89 USPQ2d 1071, 1074 (TTAB 2008); *In re Squaw Valley Development Co.*, 80

---

[10] See the *Lebanese Arak* decision for a discussion of the various provisions of Section 2(a) and the differentiation between terms asserted to be disparaging and those asserted to be scandalous.

USPQ2d 1264, 1267 (TTAB 2006). The burden of proving that a mark is disparaging rests with the USPTO. *Squaw Valley*, 80 USPQ2d at 1271.

Whether a proposed mark is disparaging must be determined from the standpoint of a substantial composite of the referenced group (although not necessarily a majority) in the context of contemporary attitudes. *Squaw Valley*, 80 USPQ2d at 1269; *Harjo v. Pro-Football, Inc.,* 50 USPQ2d 1705, 1758 (TTAB 1999), *rev'd on other grounds* 284 F. Supp. 2d 96, 68 USPQ2d 1225 (D.D.C. 2003).

Depending on the facts of the case, a proposed mark may be: (1) an innocuous term that in the context of the goods or services is disparaging, *Lebanese Arak,* 94 USPQ2d at 1223 (likely meaning of KHORAN is the Islamic holy text and use for wine disparages religion and beliefs of Muslim-Americans); *see also Doughboy Industries, Inc. v. Reese Chemical Co.*, 88 USPQ 227 (PTO Exmr. In Chief 1951) (Doughboy refers to World War I American soldier as reinforced by picture of soldier on packaging and use on "a prophylactic preparation for the prevention of venereal diseases" disparages the soldiers); (2) a disparaging term that may have a non-disparaging meaning in a specific context, *Squaw Valley*, 80 USPQ2d 1264 (SQUAW when used with ski-related goods and services means Squaw Valley ski resort under the first part of the test, but disparaging meaning remains as to other non ski-related goods and services); or (3) a disparaging term that has no non-disparaging meanings in any context, and remains disparaging despite the applicant's goods or services, actual use or intent, *In re Heeb Media LLC*, 89 USPQ2d 1071 (TTAB 2008) (applicant's good intentions and inoffensive goods and

services do not obviate finding that HEEB is disparaging in context of the goods and services; and mixed opinion among members of the referenced group does not erase the perception of a substantial composite who find it disparaging).

Findings/Analysis

We must first determine, based on the evidence of record, the "likely meaning" of THE SLANTS; and then, if there is a meaning that invokes a group of persons, turn to consider whether that meaning may be disparaging to a substantial composite of the referenced group.

*What is the likely meaning?*

The mere fact that the term has several meanings, even when many may be innocuous, does not, as applicant seems to argue, foreclose the possibility that the proposed mark is disparaging to a group of persons.[11] When we take into account the "nature of the identified services," in this case, live performances by a musical band, we are faced with a term that necessarily identifies people, i.e., the live performers. Thus, those who attend the live performances will necessarily understand THE SLANTS to refer to the persons who comprise the musical band. Further, we must consider the "manner in which the mark is used in the marketplace in connection with the services," *Lebanese Arak,* 94 USPQ2d at 1217, which the record in this case shows to involve touting the slang meaning of "slants."

---

[11] It appears to be applicant's position that a term is "inherently disparaging" when there is only one meaning for the word and that meaning is disparaging. However, when there are multiple definitions of a word and the manner of use of the word in the marketplace only points to the disparaging meaning, the term cannot be saved by the other irrelevant meanings.

Thus, it is abundantly clear from the record not only that THE SLANTS, used for the identified services, would have the "likely meaning" of people of Asian descent but also that such meaning has been so perceived and has prompted significant responses by prospective attendees or hosts of the band's performances. The evidence of public perception of the meaning of THE SLANTS, as used in connection with applicant's services, shows that meaning to be a derogatory reference to people of Asian descent.

Applicant argues that 1) the proposed mark is not inherently disparaging and there are no additional elements to make it so, and 2) there is nothing about the services that make it disparaging. The problem with applicant's analysis is that it ignores "the manner in which the mark is used in the marketplace." *Id*. The musical group, in its advertising and on its website, promotes the "likely meaning" of the mark to be people of Asian descent by, for example, displaying the wording "THE SLANTS" next to a depiction of an Asian woman, utilizing rising sun imagery and using a stylized dragon image. In addition, applicant actively seeks to associate his services with this meaning as a way to embrace this slang meaning and to "own" the stereotype represented by THE SLANTS. That applicant, or even the entire band, may be willing to take on the disparaging term as a band name, in what may be considered an attempt not to disparage, but rather to wrest "ownership" of the term from those who might use it with the intent to disparage, and that some members of the referenced group may support applicant's use, does not mean that all members of the referenced group of persons share applicant's view. In *Heeb*

11

*Media*, 89 USPQ2d at 1077, we faced and rejected a similar argument, holding that "[t]he fact that applicant has good intentions with its use of the term does not obviate the fact that a substantial composite of the referenced group find the term objectionable."

Applicant contends that the examining attorney based his conclusion as to "likely meaning" on the fact that "applicant is a founding member of a band (the Slants) that is self-described as being composed of members of Asian descent." App. Br. p. 4, quoting examining attorney's brief. Applicant argues further that:

> The Examining Attorney's rationale turned the entire policy justification for Section 2(a) on its head. It was a refusal to register based on the ethnic background of Applicant and his associates that was offensive. Unless reversed by the Board this formulation inevitably will involve the Patent and Trademark Office in inappropriate and constitutionally suspect inquiries concerning the ethnicity of applicants, their associates and their activities.

App. Br. p. 4.

Applicant is effectively arguing that because he actively seeks to convey a message that he has taken ownership of the term and its meaning, and intends no disparagement of members of the referenced group, the Office is prohibited from finding that THE SLANTS is disparaging to others, precisely because of applicant's race. In other words, applicant intentionally adopted the mark because it is disparaging to some, but we should ignore that because he is Asian and should not be perceived as intending to disparage other Asians but, rather, as redefining the term in a positive way. In essence, applicant does not address the injury that use of THE SLANTS may cause to other members of the referenced group and instead

focuses on the asserted injury to himself, which he attributes to the examining attorney's improper consideration of his ethnicity. In the same way the particular ethnicity of the people behind the corporate applicant in *Heeb Media* did not serve to obviate or remove the disparaging nature of the term for others, here, too, applicant's ethnicity does not make his use unlikely to be perceived as conveying the disparaging meaning of the term SLANTS for Asian Americans.

The focus of the inquiry into whether a mark is disparaging is not on applicant's race but rather on the referenced group's perception of the likely meaning of the mark.[12] The evidence clearly shows both that members of the referenced group ascribe the derogatory meaning based on applicant's manner of use and that members of the referenced group find it objectionable. There are no "other elements" in the mark to affect its meaning, and there is nothing about the way the mark is used in the marketplace from which one would understand the term as meaning anything other than an Asian person. Thus, the refusal is properly based on the perceptions of the referenced group and not on applicant's or his band-mates' ethnic background.

The interpretation of "slant" as meaning "person of Asian descent" (as opposed to other definitions of this word) arises because applicant's mark is used in a manner to mean "person of Asian descent." Applicant cannot claim ownership and redefine the term without a use that acknowledges the meaning that must be overcome. However, it is very important to note that a finding that THE SLANTS

---

[12] Section 2(a), 15 U.S.C. § 1052(a) focuses on the nature of the mark, not the applicant: "No *trademark* . . . shall be refused registration . . . on account of *its* nature unless *it* . . . [c]onsists of or comprises . . . matter which may disparage . . . ." (emphasis added).

is disparaging is not dependent on applicant's ethnicity, but on the circumstances related to his use of the term. An application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant shown supra would also be subject to a refusal under Section 2(a).

Finally, applicant's objection that the evidentiary record includes applicant's "past use," (i.e., use prior to the filing date of this application) and that such evidence is not within the four corners of the application, ignores the first prong of the test where we look to the "manner of use" which necessarily goes beyond the "four corners" of the application. Moreover, a determination about the view of the referenced group requires the USPTO to go outside the four corners of the application even if only to reference a dictionary definition that labels a term as derogatory. As to the date of the evidence, applicant bases his application on his use of the mark since 2006 and all evidence from then until the present is relevant.[13] Notably, applicant has not submitted evidence rebutting the evidence of

---

[13] Regarding the four corners of an application, in its brief, applicant acknowledges in general that specimens may demonstrate disparaging use. App. Br. p. 10. As noted earlier, applicant abandoned his prior application by failing to file a brief on *ex parte* appeal. Applicant then filed this application, presumably with different specimens of use. As noted by the examining attorney:

> [T]hat applicant cleverly chose specimens that avoided associations with Asians or Asian culture is not evidence that the mark is not used in a way to conjure up the derogatory meaning and to be disparaging to Asians. … It is worth mentioning that applicant appears to have reversed course on its arguments for registrability, arguing in the prior application that because the applied-for mark was being used by Asian-Americans as a self-descriptor, it could not be disparaging, while in this case arguing that there is no indication in the application that the mark is in any way associated with Asians or Asian-Americans. … Applicant's argument that the Office is limited to the four-corners of the application in determining the disparaging nature of the mark is too clever by half. Were applicant's theory correct, any

14

likely meaning, to support, for example, the proposition that due to applicant's change in its manner of use members of the referenced group no longer perceive it as having a disparaging meaning.

*Is it disparaging to a substantial composite?*

Having determined the likely meaning (in the context of the goods and services and how applicant uses the mark), we look to the second prong: is the mark disparaging to a substantial composite of the referenced group? The record establishes that the slang term "slant" or its plural "slants," when used to indicate ethnicity, is disparaging to a substantial composite of the referenced group.

While there is some mention in the record of support for applicant's mark in the Asian community (to be clear, quoted statements from applicant noting such support), "[o]ur consideration of whether the term is disparaging is not restricted to

---

> smart applicant (or smart attorney) could easily draft an identification of goods and services that skates around any mention of a group or persons associated with a particular term, while at the same time, using the mark in such a way as to associate the mark with the disparaged group. Office Action (June 20, 2012).

In response to the examining attorney, applicant, in its Request for Reconsideration, states that the refusal:

> … is premised entirely on outside evidence of Applicant's aggressively Asian-themed artistic and commercial identity as used in the past with the mark. [and the refusal is based on] his use of the mark in circumstances not reflected in the Application but relied on as grounds for refusal in a previous application [that has] been deemed offensive by third parties. Req. Recon. pp. 6-7.

Applicant's own actions highlight the wisdom of our well-settled test for determining whether a mark is disparaging, which requires not only an assessment of information on the "four corners" of the application, such as the mark and the goods or services, but also looks at the manner in which the applicant uses the mark. Indeed, we also look at an applicant's manner of use to inform analysis of other types of refusals, such as those based on genericness. *See, e.g., In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1439-40 (TTAB 2005).

15

the perception of applicant's" fans who have no objection to the name of applicant's band. *Heeb Media*, 89 USPQ2d 1077. Rather, we are charged with taking into account the views of the entire referenced group who may encounter applicant's music entertainment services in any ordinary course of trade for the identified services. Thus, all members of the Asian-American public may encounter the mark THE SLANTS in advertising in newspapers, billboards or on a website.

The dictionary definitions, reference works and all other evidence unanimously categorize the word "slant," when meaning a person of Asian descent, as disparaging. Moreover, the record includes evidence of individuals and groups in the Asian community objecting to use of the term in the context of applicant's band. Taken as a whole we find the record contains substantial evidence to support the refusal. *Squaw Valley*, 80 USPQ2d at 1272. Finally, applicant does not dispute that the band's name is derived from an ethnic slur and the evidence thereof stands unrebutted.

The fact that applicant has good intentions underlying his use of the term does not obviate the fact that a substantial composite of the referenced group find the term objectionable. *Heeb Media*, 89 USPQ2d at 1077. As the examining attorney states "while applicant may not find the term [disparaging], applicant does not speak for the entire community of persons of Asian descent and the evidence indicates that there is still a substantial composite of persons who find the term in the applied-for mark offensive." Office Action (January 6, 2012). Thus, despite applicant's assertion that "this is not yet another case of a member of an ethnic

16

group seeking registration of a supposedly offensive slur on the ground that group members, or he in particular, have 'embraced' the term" (App. Br. p. 3), in fact it is just such a case.

Applicant's argument that other SLANT marks have been registered merely underscores why, in cases such as these, where a term may have different meanings depending on the context, the USPTO looks to the manner of use to ascertain whether potential consumers would perceive the term as disparaging. None of the marks in these third-party registrations refer to people.

We emphasize that this decision only pertains to applicant's right to register the term and "it is clear that the PTO's refusal to register [applicant's] mark does not affect [his] right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, [applicant's] First Amendment rights would not be abridged by the refusal to register [his] mark." *In re McGinley*, 211 USPQ at 672, *citing Holiday Inn v. Holiday Inn, Inc.*, 534 F.2d 312, 189 USPQ 630, 635 n.6 (CCPA 1976). *See also Mavety*, 31 USPQ2d at 1928. This case is solely about whether the applicant may "call upon the resources of the federal government" to obtain federal registration of the mark on the Principal Register in order to assist applicant in enforcing the mark. *See In re Fox*, 702 F.3d 633, 105 USPQ2d 1247, 1252. Because we find it disparaging, however, the mark is disqualified under Section 2(a) for registration.

**Decision**: The refusal to register under Section 2(a) is affirmed.

17